**ORAL ARGUMENT NOT SCHEDULED**

NO. 14-7030

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

BANNEKER VENTURES, LLC,

*Appellant*,

v.

JIM GRAHAM, et al.,

*Appellees.*
_____

On Appeal from the United States District Court
for the District of Columbia

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**PROOF BRIEF OF APPELLANT
BANNEKER VENTURES, LLC**

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

Mark A. Grannis
Mark D. Davis
Anne K. Langer
HARRIS, WILTSHIRE & GRANNIS, LLP
1919 M Street, NW, Eighth Floor
Washington, D.C. 20036
Telephone:  (202) 730-1300
mgrannis@hwglaw.com

November 21, 2014                    *Counsel for Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Banneker Ventures, LLC, hereby submits the following statement of the parties, rulings under review, and related cases.

### A.      PARTIES.

The Plaintiff-Appellant in this case is Banneker Ventures, LLC.

The Defendants-Appellees are

(1)      the Washington Metropolitan Area Transportation Authority ("WMATA");

(2)      Jim Graham, a member of the D.C. City Council and former member of the WMATA Board of Directors; and

(3)      LaKritz Adler Development LLC and its principals, Joshua A. Adler and Robb M. LaKritz.

There are no intervenors or amici, and no other parties appeared in the District Court.

### B.      RULINGS UNDER REVIEW.

Banneker appeals from two rulings of the District Court:

(1)      On December 11, 2013, the Honorable Rosemary M. Collyer of the United States District Court for the District of Columbia entered a Memorandum Opinion and Order dismissing the contract claims as to WMATA (Counts I and II)

i

pursuant to Rule 12(b)(6) and the fraud claim (Count VII) pursuant to Rule

12(b)(1). (Dkt. 34).  This ruling will be published at __ F.Supp.2d ____, 2013 WL

6488274, and appears in the Joint Appendix at JA____-____.

(2)     On February 6, 2014, the Honorable Rosemary M. Collyer of the

United States District Court for the District of Columbia entered a Memorandum

and Opinion dismissing all counts against Jim Graham pursuant to Rule 12(b)(1)

on sovereign immunity grounds and dismissing the tortious-interference (Counts

III and IV) and civil-conspiracy (Count VIII) counts against Graham and LaKritz

Adler Development and its principals pursuant to Rule 12(b)(6). (Dkt. 39).  This

opinion will be published at __ F. Supp.2d ___, 2014 WL 471038, and appears in

the Joint Appendix at JA____-____.

## C.     RELATED CASES.

This case has not previously been before this Court or any other court.

There are no related cases currently pending in this Court or any other court of

which counsel are aware.

November 21, 2014                                    /s/ Mark A. Grannis_____

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1, Banneker Ventures hereby certifies that it does not have a parent corporation and that no publicly held corporation has an ownership interest in it over 10%. Banneker Ventures provides real-estate development and construction services in the District of Columbia, Maryland, and Virginia.


November 21, 2014                                    /s/ Mark A. Grannis

# TABLE OF CONTENTS

Certificate As to Parties, Rulings, and Related Cases .............................................. i

Corporate Disclosure Statement ............................................................................. iii

Table of Contents ................................................................................................... iv

Table of Authorities ............................................................................................... vi

Glossary.................................................................................................................. ix

Jurisdiction ..............................................................................................................1

Statement of Issues..................................................................................................2

Statutes and Regulations .........................................................................................2

Statement of the Case..............................................................................................3

Summary of Argument ..........................................................................................18

Standard of Review................................................................................................20

Argument................................................................................................................21

I.     The Complaint Adequately Alleged Breach of Contract and Breach of
       the Implied Duty of Good Faith and Fair Dealing by WMATA
       (Counts I and II)...........................................................................................21

       A.     Banneker Alleged that WMATA Breached the Term Sheet by
              Failing to Negotiate in Good Faith and Exclusively...........................21

       B.     Banneker Alleged a Breach of the Duty of Good Faith and Fair
              Dealing. ...............................................................................................27

II.    Banneker Adequately Alleged Tortious Interference and Civil
       Conspiracy by Graham and the LaKritz Adler Defendants (Counts III,
       IV, and VIII). ...............................................................................................29

       A.     Banneker Sufficiently Alleged Tortious Interference with a
              Contract (Count IV)............................................................................30

B.    Banneker Adequately Alleged Tortious Interference with a Business Expectancy (Count III)..........................................................33

C.    Banneker Adequately Alleged that Graham and the LaKritz Adler Defendants Participated in a Civil Conspiracy to Interfere with the Florida Avenue Deal. ............................................................39

III.    Graham Did Not Meet His Burden of Demonstrating that He Was Entitled to Absolute Immunity (Counts III, IV, and VIII). ...........................40

IV.    Banneker's Alternative Argument that WMATA Committed Fraudulent Mispresentation Should Not Have Been Dismissed (Count VII).............................................................................................................55

A.    Banneker Adequately Alleged that WMATA Committed Fraud by Continuing Sham Negotiations After It Knew that It Would Never Reach a Final Deal...................................................................56

B.    Banneker Adequately Alleged that the Nature of WMATA's Fraudulent Acts Defeats Sovereign Immunity. ...................................59

Conclusion ........................................................................................................61

Statutory Addendum ........................................................................................A1

Certificate of Compliance

Certificate of Service

v

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barr v. Matteo*, 360 U.S. 564 (1959) ........................................................43

*Beebe v. WMATA*, 129 F.3d 1283 (D.C. Cir. 1997) ...............................41

*Bennett v. Kiggins*, 377 A. 2d 57 (D.C. 1977) ........................................58

*\*Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 537 (1988) ......54

*Burkhart v. WMATA*, 112 F.3d 1207 (D.C. Cir. 1997)............................59

*\*Bishop v. Tice*, 622 F.2d  349 (8th Cir. 1980)..................................50, 51

*Carter v. Carlson*, 447 F.2d 358 (D.C. Cir. 1971) ..................................54

*Commodore-Mensah v. Delta Air Lines, Inc.*,
842 F. Supp. 2d 50 (D.D.C. 2012) ...........................................................22

*de Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013)........21

*Curaflex Health Servs., Inc. v Bruni*, 899 F. Supp. 689 (D.D.C. 1995) .................33

*Daniel v. Fulwood*, 766 F.3d 57 (D.C. Cir. 2014) ...................................20

*Doe v. McMillan*, 412 U.S. 306 (1973)  ............................................45, 46

*Forrester v. White*, 484 U.S. 219 (1988) ....................................41, 44, 46

*\*Griggs v. Washington Metropolitan Area Transit Authority*,
232 F.3d 917 (D.C. Cir. 2000)...........................................43, 44, 49, 50

*Gutierrez d Martinez v. Lamagno*, 515 U.S. 417 (1995).........................41

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)  ............................39

*Howard v. Office of Chief Admin. Officer of the U.S. House of Representatives*,
720 F.3d 939 (D.C. Cir. 2013) ....................................................................20, 21, 22

*Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin*,
402 F.3d 1249 (D.C. Cir. 2005) .......................................................................21, 22

*de Lupis v. Bonino*,
Civ. No. 07-01372, 2010 WL 1328813 (D.D.C. Mar. 31, 2010) ...........................40

*Mandel v. Nouse*, 509 F.2d 1031 (6th Cir. 1975) ....................................................52

*McKinney v. Whitfield*, 736 F.2d 766 (D.C. Cir. 1984) ..............................45, 50, 51

*McWilliams Ballard, Inc. v. Level 2 Development*,
697 F. Supp. 2d 101 (D.D.C. 2010) .......................................................................57

*Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*,
791 F. Supp. 2d 33 (D.D.C. 2011) ...........................................................33, 34, 35

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*,
No. 04-332, 2006 WL 2711527 (D.D.C. Sept, 21, 2006)........................................35

*Patterson v. United States*, 999 F. Supp. 2d 300 (D.D.C. 2013) ............................29

*Paulin v. George Washington Univ. Sch. Of Med. & Health Scis.*,
878 F. Supp. 2d 241 (D.D.C. 2012) .......................................................................27

*PM Servs. Co. v. Odoi Assocs., Inc.*,
Civ. No. 03-1810, 2006 WL 20382 (D.D.C. Jan. 4, 2006).........................32, 36, 39

*\*Stanford Hotels Corp. v. Potomac Creek Assoc., L.P.*,
18 A.3d 725 (D.C. 2011) ....................................................................23, 24, 25, 26

*United States ex rel. Landis v. Tailwind Sports Corp.*,
____F. Supp. 2d ___, 2014 WL 2772907 (D.D.C. 2014).......................................29

*Virginia Academy of Clinical Psychologists v. Group Hospitalization and
Medical Svcs., Inc.*, 878 A.2d 1226 (2005) ...........................................................57

*\*Westfall v. Erwin*, 484 U.S. 292 (1988) ............................ 41, 42, 44, 45, 46, 53, 55

*Willens v. 2720 Wisconsin Ave. Co-op. Ass'n., Inc.*,
844 A.2d 1126 (D.C. 2004) ...................................................................27


## Statutes, Regulations, & Rules

28 U.S.C. §1291 ...............................................................................1

28 U.S.C. §1332 ...............................................................................1

28 U.S.C. §1367 ...............................................................................1

28 U.S.C. § 2679 ............................................................................43

Pub. L. No. 89-774, 80 Stat. 1324 (1966), codified at D.C. Code §9-1107.01 ...1, 41

Fed. R. Civ. P. 8 ...........................................................................56

Fed. R. Civ. P. 9 ...........................................................................59

Fed. R. Civ. P. 12 .........................................................................20


## Administrative Materials

Procedures for WMATA Board of Directors .......................................13, 43, 47, 48

*Authorities principally relied upon are marked with an asterisk.

# GLOSSARY

| Term | Definition |
|------|-----------|
| Bondi Report | Bradley J. Bondi, *Report of Investigation for the Board of Directors for the Washington Metropolitan Area Transit Authority* (Cadwalader, Wickersham & Taft LLP, October 11, 2012). |
| Compl. | Banneker's First Amended Complaint and Demand for Jury Trial (Dkt. 18) filed on June 27, 2013. |
| Feb. Op. | The District Court's Opinion (Dkt. 39) dated February 6, 2014. |
| Dec. Op. | The District Court's Opinion (Dkt. 34) dated December 11, 2013. |
| Definitive Agreement | A final Joint Development Agreement. |
| LaKritz Adler Defendants | LaKritz Adler Development LLC, Joshua A. Adler, and Robb M. LaKritz. |
| Solicitation | The Joint Development Solicitation issued by WMATA in the spring of 2007. |
| WMATA | Washington Metropolitan Area Transit Authority. |

# JURISDICTION

The District Court had jurisdiction over the claims against the Washington

Metropolitan Area Transit Authority ("WMATA") under Section 81 of the

Washington Metropolitan Area Transit Regulation Compact, as amended and

adopted by Congress.  Pub. L. No. 89-774, 80 Stat. 1324 (1966) (codified at D.C.

Code §9-1107.01).  The District Court had supplemental jurisdiction over the

claims against the non-WMATA defendants under 28 U.S.C. §1367.  The District

Court also had diversity jurisdiction over the claims against the non-WMATA

defendants because the Plaintiff was a citizen of Maryland (Dkt. 37, JA_____),

whereas the defendants were citizens of New Hampshire, Virginia, and the District

of Columbia (Dkt. 38, 36) (JA_____, JA_____) and because the amount in

controversy exceeded the statutory threshold (Dkt. 18 at 98-99 ¶330) (JA_____-

JA_____).  *See* 28 U.S.C. §1332.

This Court has jurisdiction pursuant to 28 U.S.C. §1291.  The District Court

dismissed the Amended Complaint as to WMATA on December 11, 2013 (Dkt.

34, JA_____), and dismissed the Amended Complaint as to the other defendants and

entered a final judgment disposing of all parties' claims on February 6, 2014. (Dkt.

39, 40, JA_____, JA_____).  Banneker Ventures filed a timely notice of appeal on

March 7, 2014.  (Dkt. 41, JA_____).

1

## STATEMENT OF ISSUES

1.      Are Banneker's detailed allegations of WMATA's refusal to negotiate in good faith from a binding Term Sheet to a final Joint Development Agreement sufficient to state claims against WMATA for breach of contract (Count I) and breach of the covenant of good faith and fair dealing (Count II)?

2.      Are Banneker's detailed allegations of interference with the WMATA negotiations, involving nearly two years of bullying, intimidation, and harassment by a WMATA Board Member and coordinated sniping by his political cronies, sufficient to state claims for tortious interference (Counts III and IV) and conspiracy (Count VIII) against Jim Graham, LaKritz Adler Development, and the principals of LaKritz Adler?

3.      Did the District Court err in granting absolute official immunity to Jim Graham after shifting the burden of proof to Banneker?

4.      Were Banneker's alternative allegations of fraud by WMATA sufficient to state a claim for which WMATA would not have sovereign immunity (Count VII)?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Addendum to this brief.

2

## STATEMENT OF THE CASE

*Introduction.*  This case involves allegations nobody likes to believe.  We would prefer to believe that government officials do not abuse their offices to favor their political supporters.  We would prefer to believe that staffers in government agencies will do the right thing despite pressure from corrupt politicians.  And we would prefer to believe that private developers also respect fairness in government contracting, at least enough to refrain from interfering with deals they lost fair and square.  Unfortunately, none of those things held true in this case.  That, at least, is what Banneker Ventures alleged in its Amended Complaint ("the Complaint") against the Washington Metro Area Transit Authority ("WMATA"), Jim Graham, and the other defendants.  And because the Complaint clearly stated valid claims for relief that are not barred by official immunity or sovereign immunity, the District Court erred by dismissing the Complaint.

Although the details of the dispute fill many pages, the basic story is simple: Banneker and WMATA wanted to enter a contract for Banneker to develop certain real estate owned by WMATA.  They agreed on the principal terms of the deal and memorialized them in a document known as a Term Sheet.  Compl. ¶59 (JA____).[1]  The Term Sheet was not a final lease or development agreement.  But it was a

---

[1]  Throughout this document, the Amended Complaint (Dkt. 18) is cited as "Compl."

3

binding contract for the parties to *negotiate*—exclusively and in good faith—a

lease and "Joint Development Agreement" containing the terms memorialized in

the Term Sheet.  Term Sheet (JA____).

WMATA did not, however, negotiate in good faith.  The principal reason is

that defendant Jim Graham—a long-time member of the D.C. City Council and the

WMATA Board—did not want WMATA to enter an agreement with Banneker on

any terms.  Instead, Graham wanted WMATA to enter a Joint Development

Agreement with LaKritz Adler Development ("LaKritz Adler"), whose two

principals Joshua Adler and Robb LaKritz (collectively "the LaKritz Adler

Defendants") were major campaign contributors.  Compl. ¶5 (JA____).  Graham

and the LaKritz Adler Defendants agreed to inject themselves into Banneker's

contract negotiations in a variety of highly improper ways.  These tactics were part

of a coordinated effort to ensure that Banneker and WMATA would never

conclude a Joint Development Agreement—or that if they did, the LaKritz Adler

defendants would share the benefits of the deal.  Compl. ¶317 (JA____).  As a

result, WMATA put on a mere charade of negotiating, presenting continually

shifting demands.  Banneker overcame the defendants' interference many times,

managing to agree with WMATA staff on ostensibly final terms despite

WMATA's ever-changing requirements.  But each time they reached an

agreement, Graham or the WMATA Board would again change WMATA's

4

demands in an effort to kill the deal.  Compl. ¶¶137, 152-55. 159-60 (JA____,
JA____, JA____).  Ultimately, the Board elected to table the deal, cease
negotiations, keep the $100,000 fee that Banneker had paid for the right to
negotiate, and allow the negotiation period to expire.  Compl. ¶174 (JA____).

The pages that follow tell this unpleasant story in much greater detail,
highlighting the allegations that should have easily defeated the defendants'
various motions to dismiss.

* * *

*The Solicitation that Started Everything.*  WMATA owns transit facilities
throughout the Washington, D.C., metropolitan area.  Since the early 1970s,
WMATA has contracted with real-estate developers to jointly develop property
surrounding its transit facilities.  Through this "joint development program,"
WMATA seeks to promote a number of transit-related goals, including reducing
automobile dependency, promoting ridership, and increasing WMATA revenues.

In the spring of 2007, WMATA issued a Joint Development Solicitation
("Solicitation") for three parcels on Florida Avenue, NW, in Washington, D.C.
The Solicitation asked developers to submit proposals to lease or purchase the land
from WMATA and develop the site.  Although the Solicitation indicated that
WMATA preferred a 60-year lease, Solicitation §§1.1, 2.3.K (JA____, JA____), it
permitted developers to propose a sale and encouraged "creative and innovative

5

Proposals which promote Transit-Oriented Development with local land use policies." *Id.* at §2.1 (JA____).

The Solicitation required prospective developers to submit a detailed proposal—including a "site plan and a description of land uses," *id.* §2.3.G (JA____); an "[i]dentification of the portion of the Joint Development Site to be leased," *id.* §2.3.K.1 (JA____); and the "guaranteed base rent to be paid," including escalations, *id.* §2.4.D.3 (JA____). It provided that WMATA's Contracting Officer would rank each proposal and tentatively designate a "Selected Developer." *Id.* §3.1.E (JA____). WMATA would then "commence negotiation of a Term Sheet," *id.* §3.1E, which was to outline "the principal business terms for the tentatively Selected Developer's Project," *id.* §3.1.F (JA____). If the developer and WMATA's Contracting Officer successfully negotiated a Term Sheet, the Term Sheet was to be forwarded to WMATA's Board of Directors, which had final authority to approve the Term Sheet. *Id.* §3.1.G (JA____).

The Solicitation also set out the process for moving from a Term Sheet to a final Joint Development Agreement for the lease and development of the property. The Solicitation directed bidders to include "[a] statement that the Developer will pay WMATA a non-refundable option fee of $100,000 ***for the right to negotiate a Development Agreement upon designation as Selected Developer and approval of the Term Sheet***." *Id.* §2.4.D.1, 2.4.E.1 (JA____, JA____) (emphasis added). It

further notified bidders that "[a] Developer designated by the WMATA Board of

Directors as a Selected Developer will be required to pay WMATA, in

immediately available funds, a non-refundable option fee for WMATA's granting

to the Selected Developer the exclusive right to negotiate a Development

Agreement." *Id.* §3.3.B (JA____).  It then explained that "[a]fter WMATA's

Board of Directors has designated a Selected Developer and approved the Term

Sheet, WMATA staff, in coordination with the Contracting Officer, ***will negotiate***

***with the Selected Developer a Development Agreement*** (and other necessary final

documentation) that incorporates the provisions of the Term Sheet.  Such

Development ***shall be completed*** within 150 days following the WMATA Board's

designation of the Selected Developer and approval of the Term Sheet." *Id.* §3.3.C

(JA____) (emphasis added).

* * *

*Banneker's Winning Proposal, and the Term Sheet.*  In response to the

Solicitation, Banneker proposed that it and a team of cooperating developers would

create a project known as "The Jazz at Florida Avenue."  Compl. ¶¶30, 50

(JA____, JA____).  After a successful meeting with WMATA staff, Compl. ¶50

(JA____), WMATA officials tentatively designated Banneker as the Selected

Developer, Compl. ¶56 (JA____), and began to negotiate a Term Sheet as

contemplated by the Solicitation. Compl. ¶¶56-67 (JA____-JA____).  Under

7

pressure from WMATA officials to act quickly, the parties successfully negotiated

a Term Sheet in only a few days.  Compl. ¶59 (JA____).  As required by the

Solicitation, the Term Sheet included the principal business terms on which the

parties wished to contract—including a base rent of $597,000 per year, which was

more than $97,000 higher than what Banneker had originally proposed.  Compl.

¶59 (JA____).

On June 26, 2008, the WMATA Board of Directors ultimately approved the

Term Sheet—with a number of revisions—and designated Banneker as the

Selected Developer.  Compl. ¶92 (JA____).  On July 17, 2008, Banneker signed

and returned the Term Sheet.  Compl. ¶115 (JA____).  About a week later,

Banneker submitted the required $100,000 nonrefundable Option Fee.  Compl.

¶118 (JA____).

The 11-page Term Sheet was "intended to summarize the principal terms of

a proposal being considered by the undersigned parties regarding a lease of certain

real property."  Term Sheet at 1 (JA____).  It stated that "[t]he undersigned parties

wish to negotiate a Definitive Agreement"—*i.e.*, the Joint Development

Agreement—and specified that the agreement was "to be prepared initially by

WMATA and presented by WMATA to the WMATA Board for approval and

signature within five months of Board Term Sheet approval."  *Id.* §2 (JA____).

The Term Sheet contained the major terms that were to be included in that Joint

Development Agreement—the term of the lease (60 years, §2 (JA_____)), the property to be leased (§3, Ex. A (JA_____,), the specific improvements to be constructed (§4, Ex. B (JA_____), the rent to be paid by Banneker (§7 (JA_____)), and numerous other terms ranging from insurance requirements (§11 (JA_____) to indemnification (§10, (JA_____)).

Much of the Term Sheet reads like a lease. The agreement provides that "WMATA will lease to DEVELOPER approximately 28,892 sf of land area outlined in red in Exhibit A . .. ." (§3 (JA_____)). It states that "DEVELOPER will construct improvements," (§4 (JA_____)), and provides that rent "shall be paid." (§7.3 (JA_____)). Nevertheless, the final paragraph of the Term Sheet makes clear that the Term Sheet is not the *final* lease. Rather, the Term Sheet was an agreement *to negotiate in good faith a lease containing the terms outlined in the Term Sheet*:

> This Term Sheet will have no binding effect on the parties ***except*** that DEVELOPER ***shall have the exclusive right to negotiate a Definitive Agreement with WMATA for a period of five (5) months from the date of this Term Sheet. . . .*** No contract or agreement of any sort, preliminary, final, or otherwise, is intended to be created by this Term Sheet, ***except as described above.***"

(§12 (JA_____)) (emphasis added).

* * *

*Interference by Graham and the LaKritz Adler Defendants*. Despite Banneker's smooth and businesslike negotiation of the Term Sheet with WMATA

9

staff, Banneker encountered difficulties each and every time the WMATA Board got involved, even before the Term Sheet was ratified.  The root of the problem was that WMATA Board Member Jim Graham simply detested Banneker. Graham, who was also a member of the D.C. City Council, wanted to steer the Florida Avenue deal to LaKritz Adler, a competing development company controlled by his political supporters.  Compl. ¶57 (JA____).  LaKritz Adler had submitted a bid that was rejected.  Compl. ¶12 (JA____). Graham thus regarded Banneker—and Banneker's bid—primarily as an obstacle to his desire to favor LaKritz Adler with his patronage.  Graham was also in an unrelated conflict with one of Banneker's then-principals, Warren J. Williams, Jr., regarding a D.C. lottery contract.  Compl. ¶¶94-98 (JA____-JA____).  Graham also did not like Banneker because members of Banneker's development team had made monetary contributions to Graham's political opponents.  Compl. ¶98 (JA____).  Graham therefore took a number of unlawful and unethical actions to undermine Banneker's progress and prevent the consummation of any Joint Development Agreement.

Early in the selection process, Graham communicated his "expectation that before approval of the joint development agreement by WMATA, Banneker and [its principal] Karim would host a fundraiser for Graham's D.C. Council race and contribute to his Council campaign."  Compl. ¶27 (JA____).  Banneker and Karim

10

did not do so, drawing Graham's ire.  *Id.*  Then Graham bullied one of Banneker's

development partners into withdrawing from the deal—the day before an oral

interview with WMATA staff—in an effort to knock Banneker out of the running

and smooth the path for LaKritz Adler.  Compl. ¶¶40-43 (JA____-JA____).  When

Banneker decided to proceed with the interview anyway, Graham directed staffers

from the Deputy Mayor's Office to tell Banneker to withdraw instead of attending.

Compl. ¶48 (JA____).  When Banneker found a new development partner to

replace the one Graham chased away, Graham called that partner and advised him

to withdraw as well.  Compl. ¶¶52, 60 (JA____, JA____).  Thus, when Banneker

nevertheless managed to negotiate a Term Sheet with WMATA staff despite all

Graham's efforts, and the staff recommended that it be approved by WMATA's

board, that represented a direct challenge to Graham's power to steer contracts

affecting his ward, which is where the Florida Avenue project was to be located.

Graham responded by requesting that the WMATA Board consider the Term

Sheet in Executive Session, where Graham tried to kill the proposal behind closed

doors.  Compl. ¶¶63-65 (JA____-JA____).  The result was an unprecedented

deferral for 60 days.  Compl. ¶66 (JA____).  Graham then used the delay to

pressure Banneker to include LaKritz Adler in Banneker's winning proposal.

Compl. ¶70 (JA____).  Tellingly, the LaKritz Adler Defendants approached

Banneker with the same idea at the same time, sending unsolicited offers to

11

withdraw their bid if Banneker would include them in the Banneker bid—offers that clearly implied that *even after selection by WMATA staff,* Banneker's bid was in trouble as long as Graham and the LaKritz Adler Defendants went unpropitiated. Compl. ¶¶71-75; 84 (JA____-JA____, JA____).  It was also during this 60-day delay when Graham told Banneker's then-principal Williams that he could have the D.C. lottery contract he was seeking if he would withdraw Banneker from the development process for WMATA's Florida Avenue project.  Compl. ¶96 (JA____).

Banneker, however, continued to play according to the rules instead of doing business Graham's way, and the WMATA Board ratified the Term Sheet in June 2008.  Graham continued to support LaKritz Adler's competing (and now rejected) bid, and he said so publicly despite his obligation as a WMATA Board Member to be impartial.  Compl. ¶¶127, 132, 142 (JA____, JA____, JA____).  In particular, he continued to "squeeze" Banneker to include LaKritz Adler in the winning proposal, and the LaKritz Adler Defendants continued to send Banneker unsolicited proposals toward the same end.  Compl. ¶¶111-113 (JA____-JA____).  The common aim of all these tactics was to prevent WMATA from signing a Joint Development Agreement with Banneker unless LaKritz Adler were included.

So Graham was furious when, from October 2008 through December 2008, Banneker negotiated the terms of a Joint Development Agreement and lease with

12

WMATA staff and came to agreement on most of the terms. Compl. ¶126 (JA____). Unfortunately for Banneker, it was at exactly this point when Graham became the chair of WMATA's Board. Compl. ¶131 (JA____). From that point on, Graham intensified his campaign to scuttle any final agreement with Banneker, and he shifted from pressuring Banneker to simply giving orders to WMATA staff. This was manifestly beyond his authority as a WMATA Board Member: WMATA's procedures governing Board conduct expressly forbade a Board Member to "direct or supervise . . . any WMATA employee or contractor."[2] Nevertheless, the WMATA staff complied with Graham's request, breaching WMATA's duty to negotiate in good faith with Banneker.

The LaKritz Adler Defendants were not watching passively from the sidelines while Graham carried their water. As detailed below, they continually called WMATA staff in an attempt to convince the staff that it should cease negotiating with Banneker and give the deal to LaKritz Adler. On at least one occasion, they used confidential information from Graham to make a competing

---

[2] Bondi Report at 45-46 (JA____-JA____). In the wake of the allegations of misconduct by Jim Graham, WMATA hired attorney Bradley J. Bondi of Cadwalader, Wickersham & Taft LLP to investigate the allegations and prepare a report of his findings. Compl. ¶¶182-91 (JA____-JA____). The report was prepared for and funded by WMATA at a cost of more than $800,000. *Id.* ¶184. *See also* Procedures for WMATA Board of Directors 2008 at Art. I, *available at* http://web.archive.org/web/2008 1114042046/http://www.wmata.com/about/board_gm/BoardProcedures.pdf.

13

offer to WMATA, notwithstanding Banneker's right to exclusivity.  Compl. ¶261 (JA____).

Despite the interference from Graham and the LaKritz Adler Defendants, WMATA staff and Banneker ultimately managed to agree on all the terms of a final agreement.  Compl. ¶137 (JA____).  But in April 2009, Graham convinced the Board to table the deal for at least 120 days and then—once again manifestly exceeding his authority—Graham directed WMATA's staff to obtain a new appraisal for the site.  *Id.*  Then in September 2009—even though WMATA staff and Banneker had reached *another* agreement—Graham once again persuaded the Board to delay the deal, characterizing the delay as a 120-day extension of the contractual negotiation period.  Compl. ¶141 (JA____).

During the delays Graham engineered, WMATA staff decided it preferred to sell the property to Banneker, rather than leasing it as contemplated by the Term Sheet.  Compl. ¶144 (JA____).  Though modifying the deal to make these changes was expensive for Banneker, Compl. ¶148 (JA____), Banneker accommodated WMATA.  Between September and October 2009, Banneker and WMATA negotiated a revised Term Sheet which now included a sale rather than a lease. Compl. ¶145 (JA____).  Only two days later, however, Graham called a meeting at which he told Banneker that "Banneker should not have bid on the WMATA project" and that he would "not allow the sale of the Florida Avenue site."  Compl.

14

¶147 (JA____).  Nevertheless, Graham told Banneker that if Banneker would convert the deal back to a lease, he would hold a special committee meeting within two weeks, and the deal could be finalized within a month.  Compl. ¶148 (JA____).

On November 4, 2009, WMATA staff and Banneker once again agreed to final terms of a Joint Development Agreement, subject to Board approval.  Compl. ¶152 (JA____).  Nevertheless, although "every level of WMATA's staff continued to recommend that the Board move forward with the approval of a Joint Development Agreement," the WMATA Board "continued to unlawfully stall Banneker's project with the intent of running out the clock on its contract period of exclusive negotiations with WMATA."  Compl. ¶159 (JA____).  Indeed, a WMATA staff member informed Banneker that he had been directed to obtain "best and final offers" from Banneker and *two other firms*, Compl. ¶155 (JA____).  And WMATA's General Counsel then prepared a memo for Graham outlining a roadmap for how to evade Banneker's exclusive right to negotiate.  Compl. ¶160 (JA____).

In January 2010, the WMATA committee charged with handling real estate directed the WMATA staff to negotiate a new deal for Banneker "to pay additional funds to develop the Site" and extended the negotiations period until March 2010.  Compl. ¶164 (JA____).  By March 2010, Banneker and the WMATA staff had

15

once again agreed to "all material terms" for a deal, and the WMATA staff recommended that the Board approve the deal.  Compl. ¶166 (JA____).  Nevertheless, the WMATA Board, "in breach of the duty under the exclusive negotiation contract to negotiate in good faith and with fair dealing, unlawfully and indefinitely tabled approval of the executed amended Term Sheet and negotiate the JDA and Lease for the purpose of allowing Banneker's exclusive right to 'time out,'" knowing that "it was Graham's desire . . . to have the project re-bid to allow his favored developer, LaKritz Adler" to be selected.  Compl. ¶174 (JA____).

Importantly, while Graham and the LaKritz Adler Defendants were the architects and beneficiaries of this collapse in the negotiations, it is WMATA that was contractually obligated to negotiate in good faith—and exclusively with Banneker—toward a Joint Development Agreement on the terms set forth in the Term Sheet.  The Term Sheet contemplated that the parties would negotiate in good faith and sign a Joint Development Agreement within five months.  But WMATA did not keep its end of the bargain.  Although WMATA went through the motions, it did not negotiate in good faith, and the Board intentionally and in bad faith allowed the time period of Banneker's exclusive right to lapse.  Compl. ¶6 (JA____).  Significantly, when the negotiation period "expired," Banneker had agreed to everything WMATA's negotiators had requested, including change requests that were inconsistent with the Term Sheet.  Compl. ¶166 (JA ___).

16

\* \* \*

*Procedural History.*  In March 2013, Banneker sued WMATA, Graham, LaKritz Adler, and LaKritz Adler's principals.  The Amended Complaint alleged that WMATA had breached the Term Sheet by failing to negotiate exclusively and in good faith (Count I), and had also breached the implied covenant of good faith and fair dealing under the contract (Count II).  Banneker also alleged that Graham and the LaKritz Adler defendants had tortiously interfered (and conspired to interfere) with the contractual obligations in the Term Sheet and with Banneker's reasonable business expectancy of entering a Joint Development Agreement and lease with WMATA (Counts III, IV, and VIII).  The Amended Complaint also included claims for unjust enrichment, restraint of trade, and fraud (Counts V, VI, and VII).

The District Court dismissed the Amended Complaint with prejudice.  On Counts I and II, the court held that Banneker had not alleged a breach of the Term Sheet because it never alleged that WMATA negotiated with another entity while the Term Sheet was in effect.  The court did not address Banneker's allegations that WMATA had breached the contract by failing to negotiate in good faith.  As for the tort claims, the court determined that Graham, as a member of the WMATA Board, was entitled to absolute official immunity from suit.  Although the burden of proving immunity rested on Graham and Graham submitted no evidence

17

regarding the scope of his duties, the court nevertheless held that all of Graham's alleged acts of interference were within the scope of his authority and were discretionary acts.  The court then dismissed Counts III and IV against LaKritz Adler and its principals because it determined, first, that the Term Sheet was not an enforceable contract with which they could have interfered; and second, that beyond the Term Sheet, Banneker did not have a contractual expectancy in entering a final Joint Development Agreement and lease with WMATA.  The court also dismissed the other claims as to WMATA under Rule 12(b)(1) and as to the LaKritz Adler Defendants and Graham under Rule 12(b)(6).  Banneker filed a timely appeal.

## SUMMARY OF ARGUMENT

I.  Banneker alleged straightforward claims for breach of contract (Count I) and breach of the covenant of good faith and fair dealing (Count II).  The Term Sheet bound WMATA to negotiate, *in good faith and exclusively with Banneker*, a final Joint Development Agreement incorporating the agreed-upon terms. WMATA breached the contract by allowing LaKritz Adler into the negotiations with Banneker, and also by negotiating with Banneker in bad faith.  Although Banneker continually agreed to WMATA's ever-changing demands, and reached ostensibly "final" terms with WMATA staff several times, WMATA repeatedly refused to take Banneker's yes for an answer.

18

II.  The Complaint also alleged that Jim Graham and the LaKritz Adler Defendants induced WMATA to breach the contract (Count IV) and interfered with Banneker's expectancy in negotiating a final Joint Development Agreement (Count III).  The District Court found no interference because there was no breach, but that was incorrect.  The District Court also thought that there was no interference because LaKritz Adler could not control the Board's decision-making process, but that was a *non sequitur*; tortious-interference liability attaches to the *interfering* party*, not the breaching party.  Finally, the District Court dismissed Banneker's business expectancy claims on the theory that a party can never have an expectancy in a contract that requires government approval.  But the District of Columbia applies no such *per se* rule and requires only that the plaintiff demonstrate a *probability* that it would have entered the contract but for the interference.  Banneker plainly alleged that.

III. The District Court erroneously dismissed the tortious-interference and conspiracy claims against Graham on the basis of absolute official immunity.  To qualify for official immunity, Graham had the burden of proving that each of the tortious acts were within his official duties and that he was required to exercise social, political, or economic discretion in carrying out those duties.  Graham put on *no* such evidence, but the District Court improperly shifted the burden of proof to Banneker on this issue.  Even then, the record plainly demonstrated that in

19

interfering with Banneker's contract, Graham was acting well outside his job responsibilities. Although WMATA policies expressly forbade Graham to direct or supervise the conduct of WMATA employees or contractors, Graham directed WMATA staff to cease negotiations with Banneker, leaked Banneker's bid information in violation of WMATA's policies, and directed Banneker's bid partner to drop out—all of which plainly exceeded his authority. Moreover, Graham presented no evidence that any of these acts required him to exercise policymaking discretion.

IV. Banneker also pleaded in the alternative that WMATA committed fraud by promising to negotiate exclusively while intending never to do so. The District Court thought this claim was barred by sovereign immunity. But to the extent WMATA officials were aware that Graham was violating WMATA policies and actively decided to aid him, they, too, were acting contrary to express WMATA policies and therefore were outside sovereign immunity.

## STANDARD OF REVIEW

This Court reviews *de novo* a dismissal under Rule 12(b)(1) or Rule 12(b)(6). *Howard v. Office of Chief Administrative Officer of the U.S. House of Representatives*, 720 F.3d 939, 945 (D.C. Cir. 2013). That is, this Court assumes the truth of alleged facts and "then determine[s] whether they plausibly give rise to an entitlement to relief." *Daniel v. Fulwood*, 766 F.3d 57, 61 (D.C. Cir. 2014)

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court draws all

reasonable inferences in favor of the plaintiff.  *Howard*, 720 F.3d at 950 (D.C. Cir.

2013) (quoting *Iqbal*, 556 U.S. at 678); *de Csepel v. Republic of Hungary*, 714

F.3d 591, 597 (D.C. Cir. 2013).  The Court does not purport to resolve disputed

issues of fact by deciding which party's claims seem more likely, or by appealing

to extrinsic evidence that would presumably be countered with other evidence in

the course of trial.  *See Howard*, 720 F.3d at 950; *Jerome Stevens Pharm., Inc. v.*

*Food & Drug Admin.*, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005).

## ARGUMENT

**I.     THE COMPLAINT ADEQUATELY ALLEGED BREACH OF CONTRACT AND BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING BY WMATA (COUNTS I AND II).**

### A.     Banneker Alleged that WMATA Breached the Term Sheet by Failing to Negotiate in Good Faith and Exclusively.

The Complaint alleged a straightforward claim for breach of contract:

WMATA and Banneker entered a binding contract awarding Banneker "the

exclusive right to negotiate a Definitive Agreement with WMATA for a period of

five (5) months from the date of this Term Sheet."  Term Sheet at §12 (JA____);

*see also* Compl. ¶204 (JA____-JA____).  WMATA breached this obligation

because, contrary to its contractual obligation to negotiate in good faith with

Banneker, and contrary to the implied covenant of good faith and fair dealing,

WMATA did not undertake good-faith negotiations and then "intentionally and

21

unlawfully allowed the time period of Banneker's exclusive right to lapse, in bad

faith and without any explanation in an attempt to reopen the project to bids from

two other developers."  Compl. ¶12 (JA____).  The Complaint further alleges that

the breach caused damage.  *Id.* ¶¶229, 240 (JA____, JA____).  These allegations

plainly state all of the elements of breach of contract.  *See Commodore-Mensah v.*

*Delta Air Lines, Inc.*, 842 F. Supp. 2d 50, 52-53 (D.D.C. 2012) ("The elements of a

breach of contract claim are" (i) a valid contract between the parties, (ii) an

obligation or duty arising out of the contract, (iii) a breach of that duty, and (iv)

damages caused by that breach.") (quoting *Tsintolas Realty Co. v. Mendez*, 984

A.2d 181, 187 (D.C. 2009)).

The District Court nevertheless held that "[t]he Amended Complaint does

not state a claim for breach of the exclusivity agreement because it does not allege

that WMATA negotiated with another developer for development of the Project

during Banneker's exclusivity period."  Dec. Op. at 21 (JA____).[3]  This was both

incorrect and irrelevant.  It was incorrect because the Complaint alleged that the

LaKritz Adler Defendants repeatedly called WMATA staff to disparage

Banneker's bid, promote their own, and ensure that WMATA staff always knew

what LaKritz Adler was willing to offer in order to break Banneker's exclusivity.

---

[3]  Throughout this document, the December 11, 2013 Memorandum Opinion
(Dkt. 34) is cited as "Dec. Op."

Compl. ¶¶261-62 (JA____-JA____).  It is difficult to imagine a definition of "negotiate" that would not be satisfied by LaKritz Adler's communication of competing offers over a protracted period of time—especially where, as here, the recipient of those offers actually decides *not* to proceed with the deal LaKritz Adler was trying to upend.

More importantly, however, Banneker's breach-of-contract claim does not ultimately depend on whether WMATA actually negotiated with someone other than Banneker.  Banneker alleged that WMATA breached *an affirmative duty* to negotiate a Joint Development Agreement with Banneker in good faith and throughout the exclusivity period.  Under the contract, Banneker paid WMATA $100,000 for this affirmative "right to negotiate a Definitive Agreement with WMATA," Term Sheet §12 (JA____)—a right that WMATA breached by refusing to undertake good-faith negotiations.

District of Columbia law plainly recognizes the enforceability of such an agreement.  In *Stanford Hotels Corp. v. Potomac Creek Assoc., L.P.*, 18 A.3d 725 (D.C. 2011), the D.C. Court of Appeals confirmed the enforceability of a contract to negotiate exclusively and in good faith.  In that case, the parties had agreed "to negotiate exclusively and in good faith *and to sign* a Definitive Agreement if they were able to agree on terms."  18 A.3d at 734.  The trial court found, however, that the defendant (among other things) "did not negotiate in good faith; instead, it

23

'abandoned' the negotiations," "deceived" the other party "as to its real

intentions," and "acted in bad faith in refusing to sign the Definitive Agreement

after all its terms had been agreed upon." *Id*. at 734-35. Under those

circumstances, the D.C. Court of Appeals held that "it was within the authority of

the trial court to order Potomac Creek to sign the Definitive Agreement. . . ." 18

A.3d at 739.

In recognizing the enforceability of a contract to negotiate, *Stanford Hotels*

drew a distinction between two types of enforceable "preliminary agreements." A

Type I agreement "'occurs when the parties have reached complete agreement

(including the agreement to be bound) on all the issues perceived to require

negotiation. Such an agreement is preliminary only in form—only in the sense that

the parties desire a more elaborate formalization of the agreement.'" 18 A.3d at

735-36 (quoting *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491,

498 (S.D.N.Y 1987)). By contrast, in a Type II agreement, the parties have *not*

reached complete agreement on all material terms of the contract but nonetheless

"bind themselves to a concededly incomplete agreement in the sense that they

accept a mutual commitment to negotiate together in good faith in an effort to

reach final agreement within the scope that has been settled in the preliminary

agreement." 18 A.3d at 735 (quoting *Teachers Ins.*, 670 F. Supp. at 498). This

type of agreement "does not commit the parties to their ultimate contractual

24

objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate [*i.e.*, ultimate] objective within the agreed framework."  18 A.3d at 736 (quoting *Teachers Ins.*, 670 F. Supp. at 498).

The Complaint has plainly alleged an enforceable Type II agreement.  As in *Stanford Hotels*, the parties agreed that Banneker would have the "right to negotiate a Definitive Agreement with WMATA," Term Sheet §12 (JA____), and outlined numerous specific terms on which both Banneker and the WMATA Board had agreed—including the specific property to be leased (§3 (JA____)), the term of the lease (§2 (JA____)), and the consideration (§§7.2, 7.3 (JA____, JA____)).  While these already-negotiated terms were not yet binding (§12 (JA.____)), the agreement made clear that the parties were accepting one binding obligation:  to negotiate in good faith a Definitive Agreement containing the terms outlined in the Term Sheet.  *See also* Solicitation §3.3.C (JA.____) (noting that WMATA "will negotiate with the Selected Developer a Development Agreement (and other necessary final documentation) that incorporates the provisions of the Term Sheet").  Under these circumstances, *Stanford Hotels* makes clear that Banneker had the right to demand that WMATA "negotiate the open terms in good faith toward a final contract incorporating the agreed terms."  18 A.3d at 736 (quoting *Teachers Ins.*, 670 F. Supp. at 498).  WMATA was not free to "renounc[e] the

25

deal, abandon[] the negotiations, or insist[] on conditions that [did] not conform to the preliminary agreement." *Id.*

Yet the Complaint alleges that this is *exactly* what WMATA did.  It alleges that although Banneker and WMATA staff repeatedly reached agreement on a final deal for the site (Compl. ¶137, 152-55 (JA____, JA____-JA____), the WMATA Board repeatedly refused to consider it for illegitimate reasons.  It alleges that the Board repeatedly and in bad faith insisted on changes that materially differed from the Term Sheet in order to thwart negotiations—all because defendant Graham unlawfully wished to award the contract to his campaign contributors.  Compl. ¶¶26, 179 (JA____, JA____).  It alleges that WMATA repeatedly "stall[ed] Banneker's project with the intent of running out the clock on its contract period of exclusive negotiations."  Compl. ¶159 (JA____).  And it alleges that at the end of the day, the WMATA Board simply decided to "table" the deal and allow the negotiation period to expire—a clear abandonment of negotiation that *Stanford Hotels* prohibits.  Compl. ¶174 (JA____).

Despite these allegations, the court below failed even to acknowledge that the District of Columbia enforces Type II preliminary agreements, insisting that because the Term Sheet did not contain "all material terms" that were to be contained in the final Joint Development, WMATA had no enforceable contractual

26

obligations.  Dec. Op. at 22 (JA____).  That was erroneous, and the judgment of the District Court should be reversed.

### B.    Banneker Alleged a Breach of the Duty of Good Faith and Fair Dealing.

Even if the conduct described above somehow did not violate any express term of the contract, it plainly violated the covenant of good faith and fair dealing.  Under District of Columbia law, every contract contains "an implied covenant of good faith and fair dealing."  *Willens v. 2720 Wisconsin Ave. Co-op. Ass'n, Inc.*, 844 A.2d 1126, 1135 (D.C. 2004).  "A party breaches this duty by 'evad[ing] the spirit of the contract, willfully render[ing] imperfect performance, or interfer[ing] with performance by the other party."  *Paulin v. George Washington Univ. Sch. Of Med. & Health Scis.*, 878 F. Supp. 2d 241, 247-48 (D.D.C. 2012) (alteration in *Paulin*).  "The test for determining whether a Defendant's actions breached the covenant of good faith and fair dealing is a reasonableness inquiry."  *Id.*

Here, Banneker has plainly alleged that WMATA acted unreasonably by attempting to evade the spirit of the Term Sheet.  The entire point of the Term Sheet was to contractually bind the parties to negotiate exclusively and in good faith so that they could agree on and enter a Joint Development Agreement.  In the end, however, WMATA decided that it did not want to negotiate such an agreement with Banneker and—contrary to the spirit of the agreement—simply "stall[ed] Banneker's project with the intent of running out the clock on its contract

27

period of exclusive negotiations."  Compl. ¶159 (JA____).  At the end of the day,

the WMATA Board simply decided to "table" the deal and allow the negotiation

period to expire—once again undermining the purpose of the Term Sheet. Compl.

¶174 (JA____).

      The District Court did not separately explain its reasons for addressing

Count II, but it may have been influenced by its assertion in its Statement of Facts

that there were valid "business reasons for the failure of Banneker and WMATA to

reach a final contract."  Dec. Op. at 5 (JA____).  The District Court attributed this

statement to "the Bondi Report"—a report funded by WMATA and prepared by

attorney Bradley Bondi of Cadwalader, Wickersham & Taft LLP at WMATA's

direction.  The Bondi Report concluded that Graham had broken multiple

WMATA policies and was guilty of gross misconduct.  *See* Compl. ¶¶181-91

(JA____-JA____).  But while Banneker cited to portions of the Bondi Report in its

Complaint as evidence supporting its claims, it nowhere incorporated the entire

report into its Complaint or alleged that every conclusion of the report was true.

On the contrary, the conclusions of the Bondi Report are likely to be biased in

favor of WMATA, which paid over $800,000 for it, because an attorney who

prepares a public report stating that his client is guilty of misconduct is unlikely to

be hired again.  On a Rule 12(b)(6) motion, the District Court was not entitled to

weigh factual or legal assertions in a document outside the Complaint against those

28

contained in the Complaint itself.  *See United States ex rel. Landis v. Tailwind Sports Corp.*, ____F. Supp. 2d ___, 2014 WL 2772907, at *7 (D.D.C. 2014) (refusing to consider information related to prior investigation of the claims on a motion to dismiss); *Patterson v. United States*, 999 F. Supp. 2d 300 (D.D.C. 2013) (refusing to consider document referenced in complaint but not "necessarily rel[ied] on" by the plaintiff).  As a result, the District Court erred to the extent that it credited disputed factual or legal conclusions from the Bondi Report rather than the allegations in the Complaint.

Banneker plainly stated a claim for breach of the covenant of good faith and fair dealing, and the District Court's decision to dismiss that count should be reversed.

## II.    BANNEKER ADEQUATELY ALLEGED TORTIOUS INTERFERENCE AND CIVIL CONSPIRACY BY GRAHAM AND THE LAKRITZ ADLER DEFENDANTS (COUNTS III, IV, AND VIII).

WMATA bears ultimate responsibility for its failure to negotiate in good faith toward a final agreement with Banneker; no amount of misconduct by the other defendants excuses WMATA's breach.  Nonetheless, Graham and the LaKritz Adler Defendants each contributed, substantially and intentionally, to the disruption of Banneker's negotiations with WMATA and the ultimate destruction of their prospective commercial relationship.  Banneker's Amended Complaint alleged that these defendants conspired (Count VIII) to tortiously interfere both

29

with the primary contractual obligation of good-faith negotiation based on the

Term Sheet (Count IV), and with Banneker's reasonable expectation of a final

Joint Development Agreement with WMATA (Count III).

The District Court dismissed Count IV under Rule 12(b)(6), holding that

Banneker had not adequately alleged tortious interference with a contract because

the Term Sheet was not a valid contract. Feb. Op. at 22 (JA____).[4] The court

dismissed Count III because it did not believe a party could ever have an

"expectancy" in a contract that had to be approved by the WMATA Board and

because LaKritz Adler did not have the authority to control whether the WMATA

Board approved the deal. *Id*. at 20-21 (JA____-JA____). The court then dismissed

the civil-conspiracy claim simply because it had dismissed the underlying tort

claims. *Id*. This reasoning was incorrect.

## A.  Banneker Sufficiently Alleged Tortious Interference with a Contract (Count IV).

The District Court dismissed Count IV on two grounds, each of which

"piggybacked" on its erroneous finding that no contract was actually breached.

First, the court determined that the Term Sheet was not "a valid contract," Feb. Op.

at 22-23 (JA____-JA____).  Second, the court held that Banneker had never

alleged a breach of the Term Sheet. *Id*. at 23 (JA____).  These conclusions were

---

[4]   Throughout this document, the February 6, 2014 Memorandum Opinion (Dkt. 39) is cited as "Feb. Op."

incorrect for the reasons stated in Part I.  The Term Sheet *was* an enforceable

agreement, an agreement to negotiate in good faith, exclusively with Banneker.

Term Sheet, §§2, 12 (JA____, JA____).  And contrary to the reasoning of the court

below, an obligation to undertake good-faith negotiations exclusively with one

party can be breached not only by good-faith negotiations with a different party,

but also by a failure to conduct good-faith negotiations with any party at all.

Banneker *did* allege that WMATA breached the Term Sheet by failing to negotiate

in good faith toward a final Joint Development Agreement.  Banneker also alleged

that defendants Graham, LaKritz, Adler, and LaKritz Adler were all jointly

responsible for inducing this breach.  And yes, Banneker even alleged that the

LaKritz Adler Defendants had contacts with WMATA during the exclusivity

period that constituted "negotiations."  See Part I, *supra*, at 22-23.

Although the District Court made no finding on the other elements of

tortious interference with the Term Sheet contract, Banneker's Amended

Complaint included all the essential allegations.  Specifically, Banneker alleged

that Graham and the LaKritz Adler defendants knew of the contract (Comp.  ¶268

(JA____)); that they improperly induced WMATA to breach that contract (Comp.

¶269-275 (JA____-JA____)); and that Banneker was damaged (Compl.  ¶276

(JA____)).  Banneker thus alleged all the elements of tortious interference with

contract.

The District Court dismissed this count against Graham on immunity

grounds and did not reach the elements of the tort.  There can be no serious

question, however, that Banneker adequately alleged that Graham's intentional

interference led directly to WMATA's non-performance.  The Amended

Complaint makes Graham the primary wrongdoer in the entire affair.  Graham told

WMATA staff almost from the beginning that he wanted LaKritz Adler involved

on the project; he instructed staff to request "best and final offers" from LaKritz

Adler, Banneker, and one other developer when Banneker was supposed to be the

only developer still in contention; and he leaked confidential information about

Banneker's bid to LaKritz Adler so that LaKritz Adler could use the information in

an attempt to persuade WMATA staff to accept its revised bid.  Compl. ¶¶134,

155, 259 (JA____, JA____, JA____).

Furthermore, Graham's interference enabled LaKritz Adler to insert itself

into the negotiations, thus depriving Banneker of exclusivity.  Compl. ¶261

(JA____); *see PM Servs. Co. v. Odoi Assocs., Inc.*, Civ. No. 03-1810, 2006 WL

20382, at *36 (D.D.C. Jan. 4, 2006) (holding that misappropriation of confidential

information to benefit a third party gives rise to an inference of intentional

interference).  Banneker cannot know all the discussions that took place between

LaKritz Adler and WMATA during what was supposed to be an exclusive

negotiating period for Banneker, but Banneker is surely entitled to discover

32

LaKritz Adler's discussions with WMATA staff and learn the extent to which the activities of Graham and the LaKritz Adler defendants influenced WMATA's ever-changing demands. Banneker therefore alleged a *prima facie* case of tortious interference with contract. *See Curaflex Health Servs., Inc. v Bruni*, 899 F. Supp. 689, 694 (D.D.C. 1995) (emphasis in original).

### B.      Banneker Adequately Alleged Tortious Interference with a Business Expectancy (Count III).

The District Court held that Banneker had failed to state a claim for tortious interference with a contractual expectancy for two reasons: (1) because Banneker's interest in a contract was not sufficiently definite to be an "expectancy"; and (2) because LaKritz Adler and its principals "did not have the power or authority to cause the WMATA Board to vote" to approve the final Joint Development Agreement. Feb. Op. at 21 (JA____). This was also incorrect.

### 1.      Banneker Alleged a Reasonable Expectation that It Would Enter a Joint Development Agreement and Lease with WMATA.

To allege a business expectancy under D.C. law, Banneker merely needed to allege "a 'reasonable likelihood' of receiving a contract" but for the defendant's interference. *See Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 791 F. Supp. 2d 33, 56 (D.D.C. 2011) (citing *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 850 (D.D.C.1996)). The Amended Complaint plainly did that. Banneker alleged that it and WMATA had entered a binding Term Sheet outlining

33

the principal terms of a Joint Development Agreement—including the term of the

lease, the rent, the property to be leased, and ten pages of other terms.  Compl.

¶242 (JA____).  Banneker further alleged that WMATA staff provided it with the

draft Joint Development Agreement on October 7, 2008, and that by December

2008, Banneker and WMATA staff had reached an agreement on most of the

material terms.  Compl. ¶¶124, 125 (JA____, JA____).  Four months later, the two

had negotiated a deal, Compl. ¶137 (JA____), and WMATA staff at all levels

unanimously recommended that the Board approve the deal.  Banneker also

alleged that "in the context of WMATA joint development projects, the Board

rarely voted contrary to a Metro joint development staff recommendation."

Compl. ¶67 (JA____).  Banneker therefore had every reason to expect the Board

would do the same here.

     The District Court ignored these allegations, essentially applying a *per se*

rule that an entity can never have an expectancy in a contract that is subject to

approval by a government Board.  Feb. Op. at 20 (JA____) ("An expectancy that is

dependent upon approval by government bodies ordinarily is considered 'too

remote' to establish a valid expectancy.").  But District of Columbia precedent is to

the contrary.  For example, in *Nat'l R.R.*, 791 F. Supp. 2d at 56, the court explicitly

rejected such a *per se* rule and allowed a disappointed bidder for a contract with

the South Florida Regional Transportation Authority to proceed with a claim that a

34

competitor had interfered with its business expectancy in winning that contract, which had to be approved by the transportation authority's selection committee. The court found that the plaintiff's "strong presence in commuter rail operations" and ability to win contracts over the defendant in the past was a sufficient showing of a valid business expectancy. *Id*. at 57.

Banneker's business expectancy was stronger than National Railroad's in all material respects. In this case, Banneker was the chosen bidder and had reached an agreement on all terms of the Joint Development Agreement and lease that was awaiting what should have been automatic Board approval. In *Nat'l R.R.*, the plaintiff *lost* the bid to a competitor. If the *Nat'l R.R.* plaintiff had a reasonable expectation of winning the contract based solely on past practice, then Banneker had a more-than-reasonable expectation that the WMATA Board would approve the deal negotiated and recommended by staff. *See also Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2006 WL 2711527, at *20 (D.D.C. Sept, 21, 2006) (plaintiff ,which had not done business in the region in at least a decade, nonetheless had a reasonable expectancy of business with a newly formed government because of the plaintiff's research expenditures).

Banneker adequately alleged a reasonable expectation that the WMATA Board would approve a final Joint Development Agreement. While the ultimate

fact-finder may or may not agree, that is an argument for another day and not an appropriate issue to be resolved on a Rule 12(b)(6) motion.

### 2.    Banneker Alleged that the Defendants Induced the Termination of His Expectancy.

The District Court further erred in holding that Banneker failed to allege that LaKritz Adler's interference was the but-for cause of Banneker's damages because "[t]he LaKritz Adler Defendants did not have the power or authority to cause the WMATA Board to vote." Feb. Op. at 21 (JA____).[5] That is not what D.C. law requires.

To establish the causation element of tortious interference, a party need only allege a *probability* that but for the defendants' improper interference, he would have received the contract. *See PM Servs. Co.*, No. 03-1810, 2006 WL 20382, at *35 (citing *Mercer Mgmt. Consulting, Inc. v. Wilder*, 920 F. Supp. 219, 239 (D.D.C. 1996)). Banneker alleged that if not for Graham and LaKritz Adler's interference, the WMATA Board would have approved a final Joint Development Agreement and lease. Compl. ¶¶ 167, 264 (JA____, JA____).

Graham and the LaKritz Adler defendants worked diligently to undermine Banneker's business relationship with WMATA from the moment Banneker

---

[5]    As with Count IV, because the court dismissed the counts against Graham on immunity grounds, it did not reach the issue of whether Banneker adequately alleged the elements of tortious interference as to Graham.

presented its initial proposal to WMATA.  Even before then, Graham directed

Banneker's first development partner, Donatelli Development, to withdraw from

the bid the evening prior to Banneker's presentation.  Compl. ¶¶43, 46 (JA____,

JA____).  Banneker went ahead with the presentation anyway, won the

solicitation, and negotiated all terms of the Term Sheet with WMATA staff.

Compl. ¶¶49, 59 (JA____, JA____).  When the term sheet was presented to the

Board, Graham took the unprecedented step of moving to table consideration of the

term sheet for sixty days.  Compl. ¶66 (JA____).  Then, during that sixty days,

- Graham called Banneker's second developer, Metropolis, and "told him not to partner with Banneker," Compl. ¶60 (JA____);

- Graham falsely maligned Banneker principal Warren Williams, Jr., Compl. ¶72 (JA____); and

- Graham raised unfounded concerns about Banneker's "financial capabilities to develop the Site, with the hope of diminishing Banneker's qualifications and . . . improving LaKritz Adler's chances of becoming the Selected Developer," Compl. ¶65 (JA____).

In case these actions did not cause WMATA staff to reconsider the selection of

Banneker as the winning bidder, Graham also attempted to coerce Banneker into

adding LaKritz Adler to his team.  Compl. ¶¶70, 111 (JA____, JA____).  In turn,

LaKritz Adler informed Banneker that it had been told that WMATA was "waiting

until we work out something [] before [it] approve[s] our deal." Compl. ¶84

(JA____).  Finally, Graham informed Banneker Principal Omar Karim that he

37

expected him to contribute $40,000 annually to the "U Street Business Improvement District ("BID") program that Graham was spearheading." Compl. ¶¶111, 121 (JA____, JA_____).

Despite Graham's actions, the WMATA Board approved the Term Sheet and Banneker and WMATA staff reached an agreement on all terms in the Joint Development Agreement, which staff eventually presented to the WMATA Board. At this point, Banneker clearly had a reasonable business expectancy.

But Graham continued to interfere. First, Graham directed WMATA's staff to stop or delay negotiations on the Joint Development Agreement and Lease. Compl. ¶¶127, 258 (JA____, JA____), and then to go back to negotiate a revised Term Sheet. He stated that only after a revised Term Sheet was approved by the Board would the Board consider approving the Joint Development Agreement. *Id.* Graham also met with WMATA staff and directed them to find a way to include LaKritz Adler in the contract, Compl. ¶259 (JA____)—even though the Term Sheet specified that the parties would negotiate a contract with Banneker and its two business partners and that "[o]ther parties may not be included." Term Sheet §1.2 (JA____). Graham went as far as to leak confidential information about Banneker's bid to LaKritz Adler. Compl. ¶¶134, 261 (JA____, JA____). LaKritz Adler used this information to call WMATA staff, disparage Banneker's bid, promote its own, and prevent WMATA from finalizing a deal with Banneker.

38

Compl. ¶¶261-64 (JA____-JA____).  This allegation alone is sufficient to satisfy

the pleading requirement as to causation.  *See PM Servs. Co.*, No. 03-1810, 2006

WL 20382, at *36 (misappropriation of confidential information to benefit a third

party gives rise to an inference of intentional interference).  When combined with

Graham's and the LaKritz Adler defendants' continual efforts to insert LaKritz

Adler into the negotiations and undermine Banneker's ability to reach a final deal

with WMATA, these allegations demonstrate that if not for Graham and LaKritz

Adler's interference, Banneker would likely have entered a final agreement with

WMATA.

## C.     Banneker Adequately Alleged that Graham and the LaKritz Adler Defendants Participated in a Civil Conspiracy to Interfere with the Florida Avenue Deal.

 Finally, the District Court dismissed Banneker's civil-conspiracy claim

against Graham and the LaKritz Adler Defendants because conspiracy requires an

"underlying tort," and the court had already dismissed all of the tort claims.  As

explained above, however, the court erred by dismissing a number of the tort

claims, and consequently erred once again by dismissing the conspiracy claim.

To plead conspiracy under D.C. law, the defendant must allege that the

parties (1) agreed (2) to participate in an unlawful act, or a lawful act in an

unlawful manner; and (3) that at least one party performed an overt act that caused

injury (4) pursuant to the agreement.  *Halberstam v. Welch*, 705 F.2d 472, 479

(D.C. Cir. 1983) (citing *Int'l Underwriters, Inc. v. Boyle*, 365 A.2d 779, 784 (D.C. Cir. 1976)).  Even if this Court affirms the dismissal of the tortious interference claim as to one defendant, the remaining parties may still be liable for conspiring with the dismissed party.  *See de Lupis v. Bonino*, Civ. No. 07-01372, 2010 WL 1328813 (D.D.C. March 31, 2010) (citing *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)).

Here, Banneker alleged that Graham and the LaKritz Adler Defendants agreed to tortiously interfere with Banneker's contractual rights and legitimate contractual expectancy and performed numerous overt acts in furtherance of the scheme which ultimately harmed Banneker.  Compl. ¶¶317, 320-21, 324 (JA____, JA____-JA____, JA____).  Accordingly, the District Court also erred by dismissing the civil-conspiracy claim.

## III.    GRAHAM DID NOT MEET HIS BURDEN OF DEMONSTRATING THAT HE WAS ENTITLED TO ABSOLUTE IMMUNITY (COUNTS III, IV, AND VIII).

The District Court dismissed the tort claims against Graham under the theory that, as a WMATA Board Member, he had absolute immunity from suit.  Feb. Op. at 15 & n.10 (JA____).  The court first determined that Banneker bore the burden of establishing that Graham is not entitled to immunity.  *Id.* at 11 (JA____).  Then, without considering any of the specific alleged acts, the court determined that all of the alleged tortious misconduct committed by Graham was both discretionary and

40

"within the perimeter of his official duties" as a WMATA Board Member.  Feb.

Op. at 19 (JA____).  The court therefore found that Graham was immune from the

tort claims.

The District Court correctly recognized that Graham could qualify for

immunity only if the alleged acts of interference were within his job

responsibilities and if the alleged misconduct was "discretionary in nature,"

meaning that Graham had been given policy, economic, or political discretion over

the acts for which Banneker seeks to hold him liable.  *Westfall v. Erwin*, 484 U.S.

292, 297-98 (1988).[6]  But the court made a number of fundamental mistakes in

applying this standard.

The court got off on the wrong foot by improperly shifting the burden to

Banneker to establish that Graham was not immune from suit.  That gets the

analysis backwards: the Supreme Court has repeatedly cautioned that government

officials "have the burden of proving that they are entitled to absolute immunity

from the tort suit."  *Westfall*, 484 U.S. at 299; *accord Forrester v. White*, 484 U.S.

---

[6]    Although *Westfall* has been superseded by 28 U.S.C. §2679(d)(1) for the
purposes of the immunity of federal officials, *Gutierrez d Martinez v. Lamagno*,
515 U.S. 417, 425 (1995), it remains the federal common-law rule and is the
relevant standard for immunity cases involving WMATA officials.  *Beebe v.
WMATA*, 129 F.3d 1283, 1289 (D.C. Cir. 1997) (applying *Westfall* to determine
whether a WMATA official qualifies for official immunity despite noting that
"Congress has since overturned *Westfall* as it applies to federal employees.").

219, 223-24 (1988).  To meet this burden, they generally must present evidence of their official duties and the level of discretion they exercise.  *Westfall*, 484 U.S. at 299 (absolute immunity was improper when defendants had "not presented any evidence relating to their official duties or to the level of discretion they exercise").  Here, Graham presented no evidence of the scope of his duties: the District Court merely assumed that because the alleged torts involve interference with a WMATA contract, Graham must have been acting within the scope of his duties as a Board Member.  This was incorrect as a matter of law, and as explained below, factually inaccurate.

The District Court compounded its error by incorrectly concluding that the alleged acts of interference were within Graham's job duties and discretionary.  As explained below, there was no evidence suggesting that Graham was authorized to commit the acts of interference, and the documents submitted to the District Court demonstrated that he was expressly prohibited from taking many of the interfering acts—including directing WMATA staff to stop negotiating with Banneker, leaking Banneker's confidential bid information to LaKritz Adler, and directing Banneker's business partner to drop out.  Moreover, there was no reason to believe that any of these acts involved the permissible exercise of policy discretion.

42

### 1.     The Legal Standard.

Whether a WMATA official is entitled to absolute immunity is controlled by

federal common law.  To understand why, it is necessary to understand a little bit

about the legislation that created WMATA.  WMATA was created by an interstate

compact among Virginia, Maryland, and the District of Columbia.  D.C. Code §9-

1107.01, *et seq*.  The compact, which was adopted by all three jurisdictions and

passed into law by Congress, grants WMATA sovereign immunity but waives that

immunity for contract claims and certain tort claims:

> The Authority shall be liable for its contracts and for its torts and
> those of its Directors, officers, employees and agent committed in the
> conduct of any proprietary function, in accordance with the law of the
> applicable Signatory (including rules on conflict of laws), but shall
> not be liable for any torts occurring in the performance of a
> governmental function.

*Id*. at ¶80.

Because Congress consented to the WMATA interstate compact, it is a piece

of *federal* legislation, and interpretation of the compact is a question of federal law.

*Griggs v. Washington Metropolitan Area Transit Authority*, 232 F.3d 917, 923

(D.C. Cir. 2000).  Moreover, because the compact does not explicitly address the

scope of immunity for WMATA officials in their individual capacities, the

immunity of a WMATA director is governed by the federal common law as

established by *Barr v. Matteo*, 360 U.S. 564 (1959) and developed in subsequent

43

cases.  *See Griggs*, 232 F.3d at 919-23 (explaining official immunity as it relates to WMATA).

      In developing the federal common law, the Supreme Court "has generally been quite sparing in its recognition of claims to absolute official immunity," recognizing "the salutary effects that the threat of liability can have . . , as well as the undeniable tension between official immunities and the ideal of the rule of law." *Forrester*, 484 U.S. at 224.  Thus, the Court has recognized that "official immunity comes at a great cost.  An injured party with an otherwise meritorious tort claim is denied compensation simply because he had the misfortune to be injured by a federal official." *Westfall*, 484 U.S. at 295-96.  "Moreover, absolute immunity contravenes the basic tenet that individuals be held accountable for their wrongful conduct." *Id.*  As a result, the Court has cautioned that "absolute immunity for federal officials is justified only when 'the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens.'" *Id.*

      Against this background, the Supreme Court has developed a two-part standard that serves as a prerequisite to granting an official absolute immunity from tort liability: "absolute immunity from state-law tort actions should be available only when the conduct of federal officials is within the scope of their official duties *and* the conduct is discretionary in nature." *Westfall*, 484 U.S. at

297-98.  In applying this standard, the Court has rejected a "wooden interpretation" of the standard, *id.* at 298, instead directing courts to "be careful to heed the Court's admonition in *Doe* to consider whether the contribution to effective government in particular contexts outweighs the potential harm to individual citizens."  *Id.*  Thus, "the Court has not fashioned a fixed, invariable rule of immunity but has advised a discerning inquiry into whether the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens."  *Doe v. McMillan*, 412 U.S. 306, 320 (1973).  As this Court has recognized, "absolute immunity is not extended 'without some inquiry into the need of the immunity to forward legitimate purposes of the office.'"  *McKinney v. Whitfield*, 736 F.2d 766, 770 (D.C. Cir. 1984).

Such a "discerning inquiry" is completely absent from the District Court's analysis in this case.  After shifting the burden to Banneker to prove that Graham was not immune, the court simply assumed that Graham was acting within the scope of his duties and then granted immunity without even considering whether doing so was necessary to further the legitimate purposes of his office.  Had the court done so, it would have been bound to conclude that Graham was not entitled to immunity, as explained below.

45

### 2.     The Complaint Seeks to Hold Graham Liable for Numerous Acts of Interference That Were Squarely Outside His Job Responsibilities.

As the Supreme Court has emphasized, absolute immunity is "'strong medicine, justified only when the danger of [officials' being] deflect[ed from the effective performance of their duties] is very great.'" *Forrester*, 484 U.S. at 230 (alteration in original).  Therefore, before granting immunity, the District Court was required to "examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted" and then "evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Id*. at 223-24; *accord Doe*, 412 U.S. at 320 ("The scope of immunity has always been tied to the 'scope of . . . authority.'").  If the tortious acts of interference alleged in the Complaint went beyond the functions with which WMATA had entrusted Graham, the court was required to deny Graham's claim of immunity.  *Westfall*, 484 U.S. at 299.

Graham did not prove that the alleged acts of interference were within his job responsibilities.  Indeed, he submitted no evidence whatsoever regarding the scope of his job responsibilities.  Nevertheless, the Complaint plainly alleged that Graham's tortious conduct exceeded the scope of his authorized job responsibilities.  *See, e.g.*, Compl. ¶¶4, 5 n.2, 6, 131, 134, 142, 174, 238, 239, 246, 265 (JA____, JA____, JA____, JA____, JA____, JA____, JA____, JA____,

46

JA____, JA____, JA____).   Moreover, the documents submitted by the defendants

in connection with their motions to dismiss further confirmed that many of

Graham's acts of tortious interference were squarely outside the scope of his job.

The Bondi Report, which LaKritz Adler attached to its motion to dismiss,

explained that WMATA's Procedures for WMATA Board of Directors put strict

limits on the authority and responsibilities of individual Board Members.  *See*

Bondi Report at 45-46 (JA____-JA____).  Specifically, these procedures stated

that the Board was required to act collectively and directly forbade a Board

Member to direct or supervise the conduct of any WMATA employees or

contractors: "No member individually shall direct or supervise . . . any [Metro]

employee or contractor."  *Id.* (alteration in Bondi Report).[7]  Thus, while a Board

Member's responsibilities would certainly include voting on resolutions, they did

not include negotiating on WMATA's behalf or directing WMATA staff.

---

[7]   Although the Bondi Report quoted selectively from the Procedures, WMATA
has posted those procedures on its website, and this Court may take judicial
notice of them.  The 2008 version of the procedures is archived at
http://web.archive.org/web/20081114042046/http://www.wmata.com/about/boa
rd_gm/BoardProcedures.pdf.  The full relevant text from Art. I of the
procedures is as follows: "The authority of the Board of Directors is vested in
the collective body and not in its individual members. Accordingly, the Board,
in establishing or providing any policies, orders, guidance, or instructions to the
General Manager or WMATA staff, shall act as a body. No member
individually shall direct or supervise the General Manager or any WMATA
employee or contractor."

47

Banneker's tortious-interference claims, however, sought to hold Graham responsible for conduct that is far outside these limits.  They alleged, for example, that:

- Graham "directed WMATA's staff to stop negotiations of the joint development agreement" with Banneker, Compl. ¶258 (JA____), which induced WMATA to breach its contractual duty to negotiate and prevented WMATA and Banneker from reaching agreement on the Joint Development Agreement.  This was plainly outside his job responsibilities, which prohibited Graham from "direct[ing] or supervis[ing] . . . any WMATA employee or contractor."

- Graham called a meeting with WMATA staff and told them he wanted LaKritz Adler involved in the project.  Compl. ¶259 (JA____).  Once again, such direction was plainly beyond his authority.

- Graham leaked Banneker's confidential information to LaKritz Adler in violation of WMATA's procedures, Compl. ¶¶134, 261 (JA____, JA____), which specifically forbid a Board Member to "use or permit others to use information not generally available to the public obtained from the Authority through the Board Member's official position with the Authority to further the direct or indirect financial interests of a Board Member, . . . or any party to any actual or prospective financial transaction with the Authority."[8]

---

[8]  Procedures for WMATA Board of Directors 2008 at Art III. §F.1; *see also id.* at Art. III §F.2 (forbidding a Board Member to "disclose or permit others to disclose to anyone outside the Authority information obtained through their official position with the Authority and not generally available to the public except where and to the extent necessary to fulfill the Board Member's public responsibility.").

- Graham directed Banneker's business partner, Metropolis, to cease its involvement in the deal, Compl. ¶252 (JA____), a fact that WMATA ultimately used as a justification for ceasing negotiations with Banneker. Once again, Graham had no authority to direct a potential contractor, and by attempting to do so, he plainly stepped outside his job responsibilities.

Because the burden of proof was on Graham to establish that he qualified for immunity, this should have ended the matter. Nevertheless, the District Court determined that Graham's tortious conduct was within the scope of his job responsibilities because his actions "were done as part of Mr. Graham's involvement, as a WMATA Board Member and as a PDRE Committee Member, in setting contract terms for the development of the Site." Feb. Op. at 19 (JA____). In other words, the District Court appears to have believed that because the torts were committed in the course of carrying out legitimate job responsibilities, Graham was entitled to immunity. That was incorrect. As this Court has previously explained, "not all intentional or malicious torts committed in the normal course of employment necessarily fall within the scope of official duties." *Griggs*, 232 F.3d at 920 (quoting *Beebe*, 129 F.3d at 1289). The relevant question was whether the specific tortious acts alleged in the Complaint were within Graham's job responsibilities—which, as explained above, it was not.

Moreover, even if Graham had been acting within the scope of his job responsibilities, he would not be entitled to immunity because he used means that plainly exceeded his authority. When an official "is engaged in governmental

49

functions and is acting within the scope of his responsibilities, the right to invoke
absolute immunity evaporates when the conduct is 'manifestly excessive,' using
means to accomplish one's responsibilities that are 'beyond the outer perimeter of
[one's] authority.'" *Griggs*, 232 F.3d at 922. This is because there is no danger
that holding an official liable for such excessive conduct would deflect him from
fearlessly carrying out his legitimate job responsibilities. For that reason, this
Court has recognized that when an official is carrying out discretionary functions,
he is still liable for claims that he resorted to physical violence in carrying out
those responsibilities or that he threatened to file false criminal charges in carrying
out those responsibilities. *Id*. at 920; *see also McKinney*, 736 F.2d at 769-70;
*Bishop v. Tice*, 622 F.2d 349, 359 (1980).

The Eighth Circuit's decision in *Tice*, 622 F.2d at 359, which has been cited
approvingly by this Court, *see, e.g.*, *Griggs*, 232 F.3d at 920, is a useful illustration
of that principle. In that case, a federal official demanded that a subordinate
resign, or else he would file false criminal charges against the employee. *Tice*, 622
F.2d at 352. The employee sued the official for fraud and tortious interference, and
the official claimed absolute immunity because the misconduct occurred during the
course of supervising the employee, which is a discretionary function. *Id*. at 351-
52. On appeal, the Eighth Circuit denied immunity, explaining that it did not

50

matter that the official committed the torts while supervising an employee because

the official had used unauthorized means to carry out his responsibilities:

> *Barr* is of no comfort to defendants here, even assuming that Bishop's
> dismissal from employment was a matter committed to defendants'
> control.  Taking the allegations in Bishop's complaint as true,
> defendants did not simply misuse their authority but went clearly
> beyond it by threatening Bishop with criminal charges instead of
> attempting to dismiss him for cause. Although federal supervisors
> would normally enjoy absolute immunity from liability in tort for
> actions relating to the discharge of their subordinates, *see, e.g.*,
> *Mandel v. Nouse*, 509 F.2d 1031, 1033 (6th Cir. 1975), absolute
> immunity is lost when a supervisor adopts means beyond the outer
> perimeter of his authority.

*Id.* at 359.

The holding of *Tice* applies equally here.  As in *Tice*, it is irrelevant whether

Graham happened to be acting as a WMATA Board Member when he committed

tortious interference.  The Complaint alleged that Graham adopted means well

beyond his authority and in breach of numerous WMATA policies and even the

criminal law.  *See* Compl. ¶5 n.2 (JA____).  These allegations put Graham's

conduct beyond the scope of absolute immunity.  *McKinney*, 736 F.2d at 770

("general engagement in supervision within the scope of his authority does not

cloak with immunity the specific conduct at issue—his resort to manifestly

excessive means; a contrary rule would drift away from the moorings of the

functional approach."); *id.* at 769 (absolute immunity does not "'purport[ ] to

abolish the [common law] liability of federal employees for actions manifestly

51

beyond their line of duty; . . . they are accountable when they stray beyond the plain limits of their statutory authority.'").  The District Court therefore erred by dismissing the tortious-interference claims.

### 3.    The Alleged Acts Were Not Discretionary, and Many Were Squarely Contrary to WMATA Policies.

The Complaint also alleged that Graham's tortious interference involved the exercise of ministerial, rather than discretionary duties.  Compl. ¶¶300, 303, 305 (JA___, JA___, JA____).  It alleged that Graham had no discretion to act as he did, in part, because the WMATA Standards of Conduct for Board Members prohibited him from showing favoritism, from soliciting anything of value in return for official conduct, from leaking confidential bid information, and from otherwise acting under a conflict of interest.  Compl. ¶¶300, 303, 305 (JA___, JA____- JA___).  Once again, Graham had the burden of proving that despite these allegations, all of the actual acts of interference were discretionary acts—*i.e.*, acts over which WMATA had given him discretion to make social, economic, or political decisions.  Graham presented no such evidence.

This should have ended the matter.  But the District Court rejected the allegations in the Complaint and held that the acts of interference were discretionary.  The court held that Banneker had not shown that the acts were non-discretionary because "the WMATA Standards of Conduct do not mandate specific

action and Mr. Graham's actions were discretionary in nature, as they involved choices among alternatives." Feb. Op. at 17 (JA____).

It is not clear what "choices" the District Court believed had been delegated to Graham. If the court meant that Graham had the choice whether to vote for Banneker's contract, that is true, though the choice was constrained by the Standards of Conduct. But discretion about how to vote does not suggest that Graham also had discretion over the alleged acts of interference, most of which were completely independent of his vote.

In any event, the fact that "the WMATA Standards of Conduct do not mandate specific action" and that Graham's right to vote involved "choices among alternatives" should not have been dispositive. As the Supreme Court has explained, the mere fact that an official's "precise conduct is not mandated by law" does not make that official's conduct discretionary. *See Westfall*, 484 U.S. at 298. Nor does conduct become discretionary simply because it "involved choices among alternatives." Feb. Op. at 17 (JA____). As this Court has long held, "in determining whether a particular government function falls within the scope of official immunity, it does not suffice to consider simply whether the officer has 'discretion' in the sense that he exercises judgment in choosing among alternative courses of action. The proper approach is to consider the precise function at issue, and to determine whether an officer is likely to be unduly inhibited in the

53

performance of that function by the threat of liability for tortious conduct." *Carter v. Carlson*, 447 F.2d 358, 362 (D.C. Cir. 1971), *rev'd sub nom. on other grounds by D.C. v. Carter*, 409 U.S. 418 (1973) and *vacated in part*, 489 F.2d 1272 (D.C. Cir. 1974). Conduct can meet this requirement only if it is "grounded in social, economic, and political policy." *See Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 537 (1988) (sovereign immunity case).

Here, there was no reason to believe that a Board Member would be inhibited by the prospect of liability for disregarding the WMATA policy against directing individual staff members, for violating the WMATA policy against leaking confidential information, for unlawfully directing a potential contractor to drop out, for requesting something of value in return for official action, or for any of the other interfering acts taken by Graham. And there was simply no evidence that any of these acts required Graham to exercise social, political, or economic discretion. *Berkovitz*, 486 U.S. at 537. Indeed, Graham cannot even show that he had the *authority* to take the actions at issue; he certainly has not shown that he has *discretionary* authority. Absent such a showing, it was erroneous for the court below to grant him immunity.

### 4. Granting Graham Immunity from Suit Would Not Further the Purposes of Official Immunity.

In light of Graham's limited responsibilities as a Board Member and his gross departure from the limits on his authority, it would not further the purposes

of absolute immunity to cloak him with immunity from this suit.  "The purpose of such official immunity is not to protect an erring official, but to insulate the decision making process from the harassment of prospective litigation."  *Westfall*, 484 U.S.at 295.  Requiring Graham to defend a suit for tortious interference would not cause any harm to any governmental decision-making process.  The tortious-interference and conspiracy claims against Graham seek to hold Graham liable for conduct that was squarely outside his authority and over which he had no policy discretion; they will not require this Court to second-guess any decision on which Graham had policymaking discretion.  The District Court erred by granting Graham official immunity.

## IV.    BANNEKER'S ALTERNATIVE ARGUMENT THAT WMATA COMMITTED FRAUDULENT MISPRESENTATION SHOULD NOT HAVE BEEN DISMISSED (COUNT VII).

Banneker's primary factual narrative is clear:  Banneker repeatedly reached tentative final agreements with WMATA staff after the Term Sheet became a legally binding contract, but interference from Graham and the LaKritz Adler Defendants induced WMATA to break off the negotiations every time they were on the brink of consummation.  On this explanation of events, WMATA is liable in contract and the other defendants are liable in tort.  All the facts available at this stage of the proceeding tend to support this narrative.

55

But at this stage in the proceeding, Banneker has yet to discover all pertinent facts and evidence.   Therefore, it exercised its right to plead an alternative explanation for WMATA's frustrating and perplexing pattern of negotiating to the brink of agreement and then refusing to finalize a deal. *See* Fed. R. Civ. P. 8(d)(2). To wit, Banneker alleged that from the moment Graham moved that the Term Sheet be considered in executive session so that he could malign Banneker, and then moved to table discussion of the Term Sheet for sixty days, WMATA staff was well aware that the WMATA Board would *never* approve a final Joint Development Agreement with Banneker. Yet WMATA's staff continued to assure Banneker that a deal could be reached and that it should continue to make significant financial expenditures in reliance on that assurance—expenditures that would help WMATA explore other alternatives with different partners, including different versions of design floor plans, elevations, and other drawings for the site. We think this alternative theory is less likely to be true, but it may be the most likely alternative to our primary narrative, and it is a perfectly viable legal theory that the District Court should not have dismissed at the pleading stage.

### A.   Banneker Adequately Alleged that WMATA Committed Fraud by Continuing Sham Negotiations After It Knew that It Would Never Reach a Final Deal.

To state a claim for fraud, a plaintiff must allege that the defendant made (1) a false representation, (2) regarding a material fact, (3) with knowledge of its

56

falsity and (4) the intent to deceive, and (5) that the plaintiff acted in reliance on the representation. *Virginia Academy of Clinical Psychologists v. Group Hospitalization and Medical Svcs., Inc.*, 878 A.2d 1226, 1233 (2005) (quoting *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002)). A breach of a contractual promise is "actionable as fraud (misrepresentation) if at the time of its making, the promisor had no intention of carrying it out" or when "the promisor had knowledge that the events would not occur." *Id*. at 1234 (quoting *Bennett v. Kiggins*, 377 A.2d 57, 60-61 (D.C. 1977)). "Motions to dismiss for failure to plead fraud with particularity are evaluated in light of the overall purpose of Rule 9(b) to ensure that defendants have adequate notice of the charges against them to prepare a defense." *McWilliams Ballard, Inc. v. Level 2 Development*, 697 F. Supp. 2d 101, 109 (D.D.C. 2010) (explaining that Rule 9(b)'s particularity requirement must be read in conjunction with Rule 8(a)'s requirement that a plaintiff need only provide a short and plain statement of the facts) (internal quotations omitted) (citing *U.S. ex rel. Williams*, 389 F.3d 1251, 1256 (D.C. Cir. 2004)).

Banneker alleged each fraudulent misrepresentation in detail: WMATA and its agents "failed to advise . . . that WMATA would never approve a joint development agreement," Compl. ¶¶300-02 (JA____-JA____), which was material because the entire purpose of the Term Sheet was to bind WMATA to

57

negotiate exclusively with Banneker and in good faith in order to reach a final deal. *See* §____, *supra*.  What is more, "WMATA either knew or should have known that Graham had embarked upon a continuous, aggressive, and egregious course of misconduct to prevent Banneker from enjoying the period of exclusivity" or from entering a final JDA, Compl. ¶304 (JA____).  At each stage, Graham's actions were a clear sign to staff that negotiations would be vain:  Graham maligned Banneker and tabled approval of the Term Sheet, Compl. ¶¶65-66 (JA____-JA____); informed staff that he wanted LaKritz Adler to be granted the contract, Compl. ¶259 (JA____); ordered staff to delay or stop negotiations with Banneker, Compl. ¶127 (JA____); and even delayed approval of the Term Sheet because he wanted staff to get a new appraisal of the property, Compl. ¶137 (JA____).

Yet, despite all the signs that negotiations would be futile, the Board extended the period of exclusivity three times, while staff continued to represent to Banneker that they could reach a deal, Compl. ¶302 (JA____).  In this alternative narrative, Banneker alleges that WMATA staff made these representations—both the promise of exclusivity and the representations that Banneker could reach a deal—with the intent that Banneker would continue to expend time, resources, and a considerable sum of money in sham exclusive negotiations on a non-existent deal.  Compl. ¶¶310, 312 (JA____, JA____); *see Bennett v. Kiggins*, 377 A. 2d 57, 61 (D.C. 1977).  These allegations are more than sufficient to put WMATA on

58

notice of the fraudulent misrepresentations that Banneker asserts it made and

satisfy the Rule 9(b) pleadings requirements.  This count should therefore have

survived a Rule 12(b)(6) dismissal motion.

**B.     Banneker Adequately Alleged that the Nature of WMATA's Fraudulent Acts Defeats Sovereign Immunity.**

The District Court dismissed the fraud claim against WMATA after

determining that WMATA was entitled to sovereign immunity.  As the court

recognized, however, Paragraph 80 of the WMATA Interstate Compact waives

WMATA's immunity for all contract and certain tort claims by stating that

WMATA "shall be liable for its contracts and for its torts and those of its

Directors, officers, employees and agent committed in the conduct of any

proprietary function."  Thus, the question is whether the fraud alleged a tort

committed in WMATA's "proprietary" function or in its "government" function.

To determine whether WMATA's conduct is proprietary or "government"

function, this Court has adopted a two-prong test.  First, the Court should

determine whether WMATA was performing a quintessential government

function.  *Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997).  If so, it has

not waived its immunity.  *Id.*  If not, the Court should ask whether the conduct is

"discretionary" or "ministerial" as those terms have been used in the jurisprudence

construing the Federal Tort Claims Act.  *Id.*  WMATA is immune from suit for

acts involving discretion, but not for acts involving ministerial conduct.  *Id.*

59

In the District Court, WMATA conceded that its conduct was not a quintessential government function. Dec. Op. at 11 (JA____). Thus, the only issue was whether the alleged fraud was discretionary or ministerial. To determine whether conduct is discretionary, the District Court needed to address two issues that are similar to the official-immunity analysis discussed in Part III: First, the court had to consider whether a statute, regulation, or policy specifically directs WMATA's conduct. *Burkhart*, 112 F.3d at 1217. If so, the conduct was ministerial. "If, however, the governing statutes leave room for choice, an exercise of such choice is exempt from suit under the FTCA if the decision is susceptible to policy judgment and involve[d] an exercise of political, social, [or] economic judgment.'" *Id.* (quotations omitted, alterations in original).

As explained throughout this brief, the Complaint properly alleged that Jim Graham's efforts to prevent WMATA from reaching a deal with Banneker violated numerous WMATA policies, including the Standards of Conduct for Board Members, which specifically directed him not to take the actions he was taking. To the extent that any WMATA agents, whether employees or Board Members, were aware of Graham's misconduct and decided to actively assist Graham in the violation of his duties, those agents also breached a policy that "specifically directs WMATA's conduct" for sovereign immunity purposes. For this reason, WMATA

60

was not immune from the fraud claim, and the District Court erred in dismissing

the fraud claim.

## CONCLUSION

For these reasons, the Court should reverse the judgment of the District

Court.

Dated:  November 21, 2014                 Respectfully submitted,

                                          /s/ Mark A. Grannis
                                          Mark A. Grannis
                                          Mark D. Davis
                                          Anne K. Langer
                                          HARRIS, WILTSHIRE & GRANNIS, LLP
                                          1919 M Street, NW, Eighth Floor
                                          Washington, D.C. 20036
                                          Telephone:  (202) 730-1300
                                          mgrannis@hwglaw.com

                                          *Counsel for Appellant*

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

D.C. Code § 9-1107.01(80)........................................................................................A1

D.C. Code § 9-1107.01(81)........................................................................................A2

**D.C. Code § 9-1107.01(80)**

**West's District of Columbia Code Annotated**
**Division I.   Government of District.**
**Title 9.        Transportation Systems.**
**Subtitle III. National Capital Region Transportation.**
**Chapter 11. National Capital Region Transportation.**
**Subchapter IV. Washington Metropolitan Area Transit Authority Compact.**

**§ 9-1107.01. Congressional consent given to Compact amendment.**

**Liability for Contracts and Torts**

80. The Authority shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function. The exclusive remedy for such breach of contracts and torts for which the Authority shall be liable, as herein provided, shall be by suit against the Authority. Nothing contained in this Title shall be construed as a waiver by the District of Columbia, Maryland, Virginia and the counties and cities within the Zone of any immunity from suit.

**D.C. Code § 9-1107.01 (81)**

**West's District of Columbia Code Annotated**
**Division I.   Government of District.**
**Title 9.        Transportation Systems.**
**Subtitle III. National Capital Region Transportation.**
**Chapter 11. National Capital Region Transportation.**
**Subchapter IV. Washington Metropolitan Area Transit Authority Compact.**

**§ 9-1107.01. Congressional consent given to Compact amendment.**

**Jurisdiction of Courts**

81. The United States District Courts shall have original jurisdiction, concurrent with the courts of Maryland, Virginia, and the District of Columbia, of all actions brought by or against the Authority and to enforce subpoenas issued under this Title. Any such action initiated in a State or District of Columbia court shall be removable to the appropriate United States District Court in the manner provided by 28 U.S.C. § 1446.

## CERTIFICATE OF COMPLIANCE

**Type-Volume Limitation:**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby

certify that this brief contains 13,889 words, excluding the parts of the brief

exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

**Typeface**

I further certify that this brief complies with the typeface requirements of

Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of

Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared

in a proportionally spaced typeface using Microsoft Word 2007 in 14 point, Times

New Roman.


Dated:  November 21, 2014            /s/ Mark A. Grannis

## CERTIFICATE OF SERVICE

I certify that on November 21, 2014, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Mark A. Grannis