ORAL ARGUMENT SCHEDULED FOR APRIL 21, 2015

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

No. 14-7030

_____

BANNEKER VENTURES, LLC,

*Appellant*,

v.

JIM GRAHAM, *et al.,*

*Appellees.*

_____

On Appeal from the United States District Court
for the District of Columbia

_____

**FINAL JOINT BRIEF OF APPELLEES
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,
JIM GRAHAM, LAKRITZ ADLER DEVELOPMENT LLC,
JOSHUA A. ADLER, AND ROBB M. LAKRITZ**

(list of counsel on following page)

February 6, 2015

Gerard J. Stief
Washington Metropolitan Area
   Transit Authority
Office of the General Counsel
600 5th Street, N.W.
Washington, D.C. 20001
(202) 962-1463
(202) 962-2550 fax
gstief@wmata.com

*Counsel for Appellee Washington
Metropolitan Area Transit Authority*

Douglas M. Bregman
Geoffrey T. Hervey
Bregman, Berbert,
   Schwartz & Gilday LLC
7315 Wisconsin Avenue
Suite 800 West
Bethesda, Maryland 20814
(301) 656-2707
(301) 961-6525 fax
dbregman@bregmanlaw.com
ghervey@bregmanlaw.com

*Counsel for Appellee Washington
Metropolitan Area Transit Authority*

V. David Zvenyach
John Hoellen
Manasi Venkatesh
Daniel Golden
Office of the General Counsel for the
Council of the District of Columbia
1350 Pennsylvania Ave., N.W., Suite 4
Washington, D.C. 20004
(202) 724-8026
(202) 724-8129 fax
vzvenyach@dccouncil.us
jhoellen@dccouncil.us
mvenkatesh@dccouncil.us
dgolden@dccouncil.us

*Counsel for Appellee Jim Graham*

Brian L. Schwalb
Seth A. Rosenthal
Moxila A. Upadhyaya
VENABLE LLP
575 7th Street, N.W.
Washington, D.C. 20004-1601
(202) 344-4000
(202) 344-8300 fax
blschwalb@venable.com
sarosenthal@venable.com
maupadhyaya@venable.com

*Counsel for Appellees LaKritz Adler
Development LLC, Joshua A. Adler,
and Robb M. LaKritz*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Appellees submit their Certificate as to Parties, Rulings, and Related Cases.

A.     <u>Parties and Amici</u>.  All parties appearing before the district court and this Court are listed in the Brief for Appellant.

B.     <u>Rulings under Review</u>.  References to the rulings at issue appear in the Brief for Appellant.

C.     <u>Related Cases</u>.  There are no related cases of which Appellees are aware.

/s/ V. David Zvenyach
*On behalf of all Appellees*

Dated: February 6, 2015

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, Appellee LaKritz Adler Development LLC hereby states that it has no parent corporation and there is no publicly-held company that has a 10% or greater ownership in Appellee.  As it relates to this litigation, LaKritz Adler Development LLC's general nature and purpose is to develop, invest in, and manage real estate.

/s/ Moxila A. Upadhyaya
*Counsel for Appellee*
*LaKritz Adler Development LLC*

Dated: February 6, 2015

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF CONTENTS..................................................................... iii

TABLE OF AUTHORITIES ................................................................v

GLOSSARY.................................................................................... ix

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF ISSUES ...................................................................1

STATUTES AND REGULATIONS.........................................................2

STATEMENT OF THE CASE................................................................2

I.      FACTUAL BACKGROUND ........................................................2

        A.    WMATA ........................................................................2

        B.    The Florida Avenue Project .............................................4

        C.    Banneker Designated the Selected Developer ...................5

        D.    Banneker Failed to Reach Deal with WMATA .................7

II.     PROCEDURAL HISTORY .........................................................12

        A.    Banneker's Complaint...................................................12

        B.    Rulings Below ..............................................................15

        C.    Appeal ........................................................................17

SUMMARY OF ARGUMENT .............................................................18

ARGUMENT ...................................................................................20

I.      THE DISTRICT COURT PROPERLY DISMISSED COUNT I. .................20

        A.    Banneker Failed to Allege a Breach of the Term Sheet's Exclusive Negotiation Provision................................................................21

        B.    To the Extent Banneker Still Claims Breach of an Agreement to Develop the Site, the District Court Properly Dismissed that Claim. ...................25

II.     THE DISTRICT COURT PROPERLY DISMISSED COUNT II. .................28

        A.    Count II is Not an Independent Cause of Action....................28

        B.    Banneker Failed to Allege the Elements to Establish an Implied Covenant of Good Faith and Fair Dealing Claim. ...................28

III.  THE DISTRICT COURT PROPERLY DISMISSED COUNT VII. ..............29

    A.  Count VII Is Barred by WMATA's Sovereign Immunity. .....................30

    B.  Banneker Failed to Plead a Sufficient Fraud Claim. ................................32

        1.  The Complaint Did Not Plead Fraud with Particularity. .................32

        2.  The Fraud Claim Was Duplicative of Banneker's Contract Claim. .34

        3.  The Complaint Failed to Plead the Elements of Fraud. ...................34

IV.  THE DISTRICT COURT PROPERLY CONCLUDED THAT ABSOLUTE
     IMMUNITY BARS SUIT AGAINST GRAHAM. ........................................35

    A.  Graham Acted Within the Scope of His Official Duties. ........................36

    B.  Graham's Conduct Was Discretionary. ...................................................40

V.  BECAUSE BANNEKER FAILED TO ALLEGE ESSENTIAL ELEMENTS
    OF TORTIOUS INTERFERENCE, THE DISTRICT COURT'S DISMISSAL
    OF COUNTS III AND IV SHOULD BE AFFIRMED. ..................................43

    A.  The District Court Properly Dismissed Banneker's Claim for Tortious
       Interference with Prospective Business Advantage (Count III). .............44

        1.  Banneker Did Not Allege the Existence of a Valid Business
           Expectancy. .........................................................................................44

        2.  Banneker Did Not Allege Intentional Interference and Causation. ...49

           a.  Graham ........................................................................................49

           b.  LAD .............................................................................................53

    B.  The District Court Properly Dismissed Banneker's Claim for Tortious
       Interference with Contract (Count IV). ...................................................58

VI.  BANNEKER'S CLAIM OF CIVIL CONSPIRACY (COUNT VIII) MUST
     FAIL BECAUSE THE UNDERLYING TORT CLAIMS FAIL. ...................58

VII. THE NOERR-PENNINGTON DOCTRINE IMMUNIZES LAD. ................59

VIII.     CONCLUSION. .........................................................................................62

STATUTORY ADDENDUM ................................................................ A-1

CERTIFICATE OF COMPLIANCE ..............................................................

CERTIFICATE OF SERVICE ........................................................................

# TABLE OF AUTHORITIES

## Cases

*\* Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001) ...................................................................60

*Arcadian Phosphates, Inc. v. Arcadian Corp.*,
  884 F.2d 69 (2d Cir. 1989)........................................................................26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................... 52, 54

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
  81 F. Supp. 2d 602 (D. Md. 2000), *aff'd*, 237 F.3d 394 (4th Cir. 2001) ............60

*\* Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*,
  383 F. Supp. 2d 32 (D.D.C. 2005) ...............................................................56

*\* Beebe v. WMATA*,
  129 F.3d 1283 (D.C. Cir. 1997) ............................................................ 36, 37

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*,
  45 F.3d 493 (D.C. Cir. 1995) ......................................................................56

*Bishop v. Tice*,
  622 F.2d 349 (8th Cir. 1980)......................................................................39

*Brown v. Carr*,
  503 A.2d 1241 (D.C. 1986)........................................................................44

*Brownsville Golden Age Nursing Home, Inc. v. Wells*,
  839 F.2d 155 (3d Cir. 1988)......................................................................60

*\* Carr v. Brown*,
  395 A.2d 79 (D.C. 1978)...........................................................................47

*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*,
  228 F.3d 24 (1st Cir. 2000) .......................................................................11

*\* Columbia v. Omni Outdoor Adver., Inc.*,
  499 U.S. 365 (1991) .................................................................................61

*\* Democratic State Comm. of D.C. v. Bebchick*,
  706 A.2d 569 (D.C. 1999)...................................................................... 45, 47

*Eurotech Inc. v. Cosmos European Travels Aktiengesellschaft*,
  189 F. Supp. 2d 385 (E.D. Va. 2002)............................................................60

\* *Exec. Sandwich Shoppe, Inc. v. Carr Realty Grp.*,
749 A.2d 724 (D.C. 2000) ...................................................................59

*FDIC v. Bender*,
127 F.3d 58 (D.C. Cir. 1997) ..............................................................49

*Genetic Sys. Corp. v. Abbott Labs.*,
691 F. Supp. 407 (D.D.C. 1988) ..........................................................56

\* *Gray v. Poole*,
243 F.3d 572 (D.C. Cir. 2001) ............................................................40

*Harris v. Koenig*,
602 F. Supp. 2d 39 (D.D.C. 2009) .......................................................33

*Havoco of Am., Ltd. v. Hollobow*,
702 F.2d 643 (7th Cir.1983) .................................................................60

*Hecht v. Pro-Football, Inc.*,
444 F.2d 931 (D.C. Cir. 1971) ...................................................... 61, 62

*Hinton v. Corrections Corp. of Am.*,
624 F. Supp. 2d 45 (D.D.C. 2009) .......................................................11

*Hopkins v. Women's Div., Gen. Bd. of Global Ministries*,
238 F. Supp. 2d 174 (D.D.C. 2002) ............................................. 26, 49

*IGEN Int'l, Inc. v. Roche Diagnostics GMBH*,
335 F.3d 303 (4th Cir. 2003) ...............................................................60

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ..............................................................11

*Jones v. WMATA*,
742 F. Supp. 24 (D.D.C. 1990) ...........................................................61

\* *KiSKA Constr. Corp. v. WMATA*,
321 F.3d 1151 (D.C. Cir. 2003) ................................................... 41, 42

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) .............................................................33

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991) ................................................................11

*Kreuzer v. George Washington Univ.*,
896 A.2d 238 (D.C. 2006) ...................................................................56

*Lee v. Bos*,
874 F. Supp. 2d 3 (D.D.C. 2012) .........................................................32

*McKinney v. Whitfield,*
  736 F.2d 766 (D.C. Cir. 1984) ...................................................39

*Minch v. District of Columbia,*
  952 A.2d 929 (D.C. 2008) ........................................................38

* *Modis, Inc. v. Infotran Sys., Inc.,*
  893 F. Supp. 2d 237 (D.D.C. 2012) ........................................ 56, 58

*Murray v. Wells Fargo Home Mortg.,*
  953 A.2d 308 (D.C. 2008) ........................................................44

*Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.,*
  791 F. Supp. 2d 33 (D.D.C. 2011) ...........................................48

* *Novecon Ltd. v. Bulgarian-Am. Enter. Fund,*
  190 F.3d 556 (D.C. Cir. 1999) .................................................28

* *Oberndorf v. City and Cnty. of Denver,*
  900 F.2d 1434 (10th Cir. 1990) ...............................................61

*Oceanic Exploration Co. v. ConocoPhillips, Inc.,*
  No. 04-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006) ...................48

*One-O-One Enterprises, Inc. v. Caruso,*
  668 F. Supp. 693 (D.D.C. 1987) ..............................................35

*Paulin v. George Washington Univ.,*
  878 F. Supp. 2d 241 (D.D.C. 2012) ..........................................20

*Plesha v. Ferguson,*
  725 F. Supp. 2d 106 (D.D.C. 2010) ..........................................35

*PM Servs. v. Odoi Assocs., Inc.,*
  Civ. No. 03-1810, 2006 WL 20382 (D.D.C. Jan. 4, 2006) ................57

*Robertson v. Cartinhour,*
  867 F. Supp. 2d 37 (D.D.C. 2012) ...........................................44

*Sanders v. WMATA,*
  819 F.2d 1151 (D.C. Cir. 1987) ...............................................49

*Stanford Hotels Corp. v. Potomac Creek Assocs.,*
  18 A.3d 725 (D.C. 2011) ............................................ 21, 23, 24, 25

* *Teachers Insurance & Annuity Ass'n. v. Tribune Co.,*
  670 F. Supp. 491 (S.D.N.Y. 1987) ...........................................26

*Westfall v. Erwin,*
  484 U.S. 292 (1988) ............................................................ 36, 40

*Whelan v. Abell*,
    48 F.3d 1247 (D.C. Cir. 1995) ............................................................60

*Williams v. Romarm, SA*,
    756 F.3d 777 (D.C. Cir. 2014) .................................................. 29, 31

*WMATA v. Quik Serve Foods, Inc.*,
    Nos. 04-838(RCL); 04-687(RCL), 2006 WL 1147933 (D.D.C. Apr. 28, 2006) .29

**Statutes**

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1367 ......................................................................................1

D.C. Code § 9-1107.01 ..........................................................................59

D.C. Code § 9-1107.01(12)(d), (f) ..........................................................3

D.C. Code § 9-1107.01(4) ....................................................................2, 3

D.C. Code § 9-1107.01(8) ......................................................................33

Pub. L. No. 89-774, reprinted at D.C. Code § 9-1107.01(81) (2001) ......................1

**Rules**

Federal Rule of Civil Procedure 12(b)(6) .................................. 16, 17, 29

Federal Rule of Civil Procedure 9(b) ........................................ 29, 32, 33

\*Authorities upon which Appellees chiefly rely are marked with an asterisk

# GLOSSARY

| Term | Definition |
|------|-----------|
| App. Br. | Brief of Appellant Banneker Ventures, LLC |
| Banneker | Plaintiff-Appellant Banneker Ventures LLC |
| Bondi Report | Bradley J. Bondi, *Report of Investigation for the Board of Directors for the Washington Metropolitan Area Transit Authority* (Cadwalader, Wickersham & Taft LLP, Oct. 11, 2012) (Dkt. 20-2, Ex. C) |
| Compl. | Amended Complaint (Dkt. 18) |
| Dec. Op. | The District Court's December 11, 2013 Memorandum Opinion (Dkt. 34) |
| Feb. Op. | The District Court's February 6, 2014 Memorandum Opinion (Dkt. 39) |
| Graham | Defendant-Appellee D.C. Councilmember Jim Graham |
| JA | Joint Appendix |
| JDS or Solicitation | Shaw-Howard/Florida Avenue Joint Development Site: Proposal Submission Requirements (Dkt. 20-2, Ex. B) |
| LAD | Defendants-Appellees LaKritz Adler Development LLC, Joshua A. Adler, and Robb M. LaKritz |

PDRE

WMATA's Planning, Development and Real Estate Committee

Term Sheet

WMATA Joint Development Term Sheet Shaw-Howard/Florida Avenue Sites dated July 17, 2008 (Dkt. 20-2, Ex. A)

WMATA

Defendant-Appellee
Washington Metropolitan Area Transit Authority

## STATEMENT OF JURISDICTION

Banneker alleged that the district court had jurisdiction over the claims against the Washington Metropolitan Area Transit Authority ("WMATA") pursuant to Section 81 of the Interstate Compact, Pub. L. No. 89-774, reprinted at D.C. Code § 9-1107.01(81) (2001), and supplemental jurisdiction over the claims against the non-WMATA defendants under 28 U.S.C. § 1367. Appellate jurisdiction is predicated upon 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether the district court correctly dismissed Banneker's claim against WMATA for breach of contract (Count I) for an exclusive right to negotiate.

2.    Whether the district court correctly dismissed Banneker's claim against WMATA for breach of the covenant of good faith and fair dealing (Count II).

3.    Whether the district court correctly held that WMATA enjoyed sovereign immunity from Banneker's fraud claim (Count VII).

4.    Whether the district court correctly held that Graham enjoyed absolute immunity from Banneker's claims.

5.    Whether the district court correctly dismissed Banneker's claims against Graham and LAD[1] for tortious interference with prospective business advantage (Count III) and contract (Count IV).

6.    Whether the district court correctly dismissed Banneker's claims against Graham and LAD for conspiracy (Count VIII).

7.    Whether LAD is entitled to immunity under the *Noerr-Pennington* doctrine.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Addendum to this brief.

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND

### A.    WMATA

WMATA is an instrumentality and agency of Maryland, Virginia, and the District of Columbia, created by an Interstate Compact to construct and operate a regional transit system.  D.C. Code § 9-1107.01(4).  WMATA has a governing board of eight directors, consisting of two voting directors each appointed by Maryland, Virginia, the District, and the United States, and eight alternate, non-voting directors ("Board").  *Id.* § 5(a).  Individual directors have no authority to

---

[1]    LAD refers to Appellees Lakritz Adler Development, LLC and its principals, Joshua A. Adler and Robb M. LaKritz.

bind or act independently on WMATA's behalf.  *Id.* § 8.  Board action is only effective if a majority, which must include at least one director or alternate from each signatory, is present and voting.  *Id*.

In 1999, the District appointed Councilmember Graham as one of the two District voting members on the Board.  Compl. ¶ 4 n.1 (JA0012).[2]  Graham served as a voting member at all relevant times, and chairman from January 2009 to January 2010.  *Id.* ¶¶ 4 n.1, 162, 259 (JA0012, 0051-52, 0081).  Graham was also a member and, at times, chair of WMATA's Planning, Development and Real Estate Committee ("PDRE"), which oversaw WMATA's real estate projects.  *Id.* ¶¶ 257, 269, 327 (JA0080-81, 0084, 00106).

WMATA has the authority to acquire, own and convey property and the authority to enter into contracts, leases and agreements.  D.C. Code § 9-1107.01(12)(d), (f).  Pursuant to those powers, WMATA administers a "joint development program," by which it leases or sells WMATA-owned property located near its Metrorail stations to developers who improve the sites with development projects.  WMATA Mot. to Dismiss (Dkt. 22-1) at 3-4.  As part of the program, WMATA has adopted "Joint Development Policies and Guidelines," under which the Board retains responsibility for, *inter alia*, authorizing joint development solicitations, approving preliminary developer selection and non-

---

[2]     The Amended Complaint (Dkt. 18) is referred to as "Complaint" and cited as "Compl."

binding term sheets and approving binding Joint Development Agreements (final contracts). *Id.*

### B.   The Florida Avenue Project

In spring 2007, WMATA sought interest for the joint development of its land located on Florida Avenue, between 7th and 9th Streets, in Northwest D.C. ("Site"). Compl. ¶¶ 1, 22 (JA0011, 0018).  Twelve developers, including Banneker and LAD, responded.  *Id.* ¶ 23 (JA0018).  WMATA subsequently invited six developers to submit proposals pursuant to a solicitation titled "Shaw-Howard/Florida Avenue Joint Development Site: Proposal Submission Requirements." ("Solicitation").  *Id.* ¶ 25 (JA0018).

Under the Solicitation, WMATA would designate one bidder as the Selected Developer with which WMATA would negotiate a non-binding Term Sheet providing the Selected Developer an opportunity to negotiate a Development Agreement.  JDS §§ 3.1.E., 6 (JA00129-30, 00136-38).[3]  The Solicitation required that the Board approve both the Term Sheet and the Selected Developer.  *Id.* §§ 3.1.F., 3.1.G., 3.3.C. (JA00130).   The Development Agreement had to be concluded within 150 days following the approval of the Term Sheet.  *Id.* § 3.3.C. (JA00130).  Importantly, the Solicitation provided:

> In the event that this schedule is not met, the Selected Developer designation expires, the Proposal is no longer viable, and WMATA

---

[3]      The Solicitation (Dkt. 20-2, Ex. B) is cited as "JDS."

4

may retain [certain fees paid to WMATA by the Selected Developer] .
. . .  WMATA may choose to reestablish the Selected Developer
designation and provide a specific time frame to the Selected
Developer for the completion of negotiations or to re-advertise the
Joint Development Site.

*Id.*

In the Solicitation, WMATA notified all bidders that neither the Solicitation
nor the Term Sheet created any binding agreement, and that no agreement would
exist unless the Board approved and executed a Development Agreement. *See id.*
at §§ 1.7, 3.3.D. (JA00122, 00131).

### C.    Banneker Designated the Selected Developer

WMATA received three responses, each of which proposed a long-term
ground lease. Compl. ¶ 29 (JA0019). The net present value of each offer was:

| | | |
|---|---|---|
| 1) | Banneker | $14.0 million |
| 2) | Moddie Turay Co. | $11.8 million |
| 3) | LAD | $6.0 million |

Bondi Report 15-16 (JA00155-56).[4]   On June 26, 2008, WMATA selected
Banneker's proposal. Compl. ¶¶ 2, 92, 115 (JA0011-12, 0035, 0040). In its
approval, the Board requested that any final agreement include an affordable-
housing component and further definition of the roles of Banneker's development
team. Bondi Report 3 (JA00143).

---

[4]    The October 11, 2012 Report of Investigation issued by Cadwalader,
Wickersham & Taft LLP (Dkt. 20-2, Ex. C) is referred to as the "Bondi Report."

On July 17, 2008, Banneker and WMATA executed a Term Sheet[5] that gave Banneker an exclusive right to negotiate a "Definitive Agreement" to be approved and signed by the Board within five months.  Compl. ¶¶ 116, 211 (JA0040, 0066); Term Sheet § 2 (JA00111).  Consistent with the Solicitation, the Term Sheet did not create a binding agreement and did not grant Banneker anything more than the right to negotiate with WMATA for a limited period of time:

> This Term Sheet **will have no binding effect** on the parties except that DEVELOPER shall have the exclusive right to negotiate a Definitive Agreement with WMATA for a period of five (5) months from the date of this Term Sheet.  Any expenditures undertaken by either party hereto are at its own risk.  No contract or agreement of any sort, preliminary, final or otherwise, is intended to be created by this Term Sheet, except as described above.

Term Sheet § 12 (JA00121) (emphasis added).

The Term Sheet did not contain key material provisions that would be included in any Definitive Agreement (*e.g.,* provisions regarding affordable housing, financing, insurance, and qualified development partner requirements) and made clear that there were yet-to-be-satisfied pre-conditions to any such agreement.  Section 8.4, for instance, provided that WMATA would not be bound by a Definitive Agreement "unless and until" the Board formally approved it.  *Id.* § 8.4 (JA00117).  Section 8.6, entitled "Financing Contingency," provided that Banneker would have to receive financing "consistent with the approved

---

[5]     The Term Sheet (Dkt. 20-2, Ex. A) is cited as "Term Sheet."

development budget" and "satisfactory" to WMATA.  *Id.* § 8.6 (JA00117).

Section 9.8 required Banneker to obtain performance and payment sureties from a

third-party guarantor.  *Id.* § 9.8 (JA00119).

### D.     Banneker Failed to Reach Deal with WMATA

After the Term Sheet was signed, the parties began a five-month exclusive

negotiation period.  *Id.* § 12 (JA00121).  Unable to reach a Definitive Agreement

within that period, WMATA extended Banneker's exclusive negotiation rights

three times, providing Banneker with an additional fifteen months to negotiate.

Compl. ¶ 18 (JA0017).  Despite these extensions, the parties could not reach an

agreement.

These extensions reflect the conceptual distance between a Term Sheet and a

Definitive Agreement.   One difficulty encountered in the negotiations was

Banneker's decision to dramatically reduce its financial offer immediately after the

parties executed the Term Sheet.  *Id.* ¶ 123 (JA0042); Bondi Report 23 (JA00163).

In June 2008, before either party signed the Term Sheet, WMATA required that

the Site development include affordable housing.   Bondi Report 3 (JA00143).

Though aware of the affordable housing requirement before it signed the Term

Sheet, by April 2009, Banneker slashed its offer from $14 million to $5.8 million

in response to this requirement. Dec. Op.[6] at 4 (JA00206) (citing Bondi Report 23). The new offer was below the other bids and below the Site's $7.5 million appraised value. *Id.* WMATA responded to Banneker's reduced offer by seeking a new appraisal of the Site. *Id.*; Compl. ¶ 138 (JA0046). The appraisal, obtained after WMATA extended Banneker's negotiation period by another 120 days, came in at a lower value, and led Banneker to lower its offer more. Bondi Report 23, n.65 (JA00163); Compl. ¶ 137 (JA0046). Although the new offer prompted the Board to question whether it should proceed with the project, on September 24, 2009, the Board again extended Banneker's exclusive negotiation period for an additional 120 days. Bondi Report 23 (JA00163); Compl. ¶ 141 (JA0047).

Another stumbling block in the negotiations was Banneker's inability to retain an experienced development partner, which WMATA required as a condition of approving the Term Sheet. Bondi Report 3 (JA00143). In late 2008, the partners identified in the Term Sheet, District Development Group, LLC and Metropolis, withdrew from Banneker's team. Compl. ¶ 136 (JA0045-46); Bondi Report 26, n.82 (JA00166); Term Sheet § 1.2 (JA00111). Banneker then began pursuing another co-developer, Banc of America Community Development Company ("BACDC"), and purportedly secured a letter of interest from BACDC on March 6, 2009. Compl. ¶ 130 (JA0043-44). But within the following year, as

---

[6]    The December 11, 2013, Memorandum Opinion (Dkt. 34) is cited as "Dec. Op."

negotiations proceeded, BACDC also withdrew.  Bondi Report 26 (JA00166).  Banneker did not locate a replacement.  *Id*.

Yet another problem was that the structure of the potential transaction kept changing.  The Term Sheet contemplated that Banneker would ground lease the Site.  In October 2008, however, Banneker's principal, Omar Karim, informed WMATA that he had entered into an agreement to purchase an adjacent lot.  *Id.* at 23 (JA00163).  WMATA informed Karim that expanding the development property to include the lot was not part of the Term Sheet and would be impracticable because it would curtail WMATA's rights to terminate Banneker's ground lease in the event of a default.  *Id*. at 24 (JA00164).  Nevertheless, WMATA agreed to review Banneker's proposal to include the adjacent lot.  *Id*.  After negotiating lease arrangements for several months, however, the parties changed course and attempted to negotiate Banneker's outright purchase of the property.  *Id*.; Compl. ¶¶ 143-146 (JA0047-48).   Ultimately, the parties went back to negotiating the lease option.  Bondi Report 24 (JA00164); Compl. ¶¶ 156-158, 165 (JA0050-52).

Because key putative terms of any potential deal kept changing as negotiations progressed, the parties stopped working on a Definitive Agreement and began trying to craft a revised Term Sheet.  Compl. ¶¶ 149, 154, 165 (JA0049-50, 0052).  On January 28, 2010, as the parties continued working through the

9

revised Term Sheet, *id*. ¶ 165 (JA0052), the Board voted yet again to extend Banneker's negotiation period to March 31, 2010, with Graham abstaining from the vote. Bondi Report 27 (JA00167).

The Board considered the Florida Avenue project on March 25, 2010, six days before Banneker's thrice-extended exclusive negotiation period was set to expire. Compl. ¶¶ 171, 174 (JA0053-54); Bondi Report 28 (JA00168). At that meeting, Graham moved for additional time to negotiate the revised Term Sheet based on the Board's continuing concerns regarding the absence of an experienced development partner and Banneker's dramatically reduced purchase price. Bondi Report 28 (JA00168). Board member and Deputy Mayor Neil Albert countered Graham's proposal with a motion to table the item, which the Board unanimously approved. *Id*.; Compl. ¶ 174 (JA0053). Banneker's exclusive negotiation period expired on March 31, 2010. Bondi Report 28 (JA00168); Compl. ¶ 176 (JA0054).

Considering the Bondi Report,[7] which was incorporated into the Complaint, the district court observed:

---

[7]      Banneker incorrectly claims that the district court erred in incorporating the Bondi Report into Banneker's Complaint and in referring to sections of the Bondi Report that Banneker chose not to cite in the Complaint. App. Br. 28-29. Banneker relied on and cited the Bondi Report extensively in its Complaint, and there is no question that Banneker's claims necessarily rely on the Report. Banneker even relied extensively on the Report in its oppositions to Defendants' motions to dismiss, in some instances citing it up to twenty-five times. *See, e.g.*, LAD Reply in Supp. of Mot. to Dismiss (Dkt. 31) at 4. As such, the district court was not obligated to consider only the sections Banneker had cherry picked, but

> Metro and Banneker Ventures confronted numerous obstacles to finalizing a term sheet, including Banneker's lack of development experience, the absence of a clear Metro policy on key aspects of the term sheet, concerns and inquiries raised by Metro Board Members, and the financial and economic crisis that impacted the real estate market. The inability of Banneker and Metro to anticipate and solve these problems caused numerous delays that ultimately prevented the parties from presenting a final term sheet to the Metro Board before Banneker Ventures's exclusive negotiation period.

Dec. Op. 4 (JA00206) (citing Bondi Report 21-22). The district court also noted that there were "rational business reasons" for Banneker's inability to reach a deal with WMATA over nearly two years of negotiations, including Banneker's own failure to "mak[e] a reasonable financial offer and find[] a reliable development partner . . . even though the Metro Board made it clear to Banneker [] that it must partner with one. As Banneker [] struggled to resolve these issues, it lost support among Metro Board members." Feb. Op.[8] 5, n.6 (JA00235) (citing Bondi Report 5); *see also* Dec. Op. 4-5 (JA00206-07) (observing that "Banneker was unable to retain an experienced development partner, as required by WMATA from the

---

instead could properly consider the entire document in determining the plausibility of Banneker's claims. *See, e.g.*, *Hinton v. Corrections Corp. of Am.*, 624 F. Supp. 2d 45, 46-47 (D.D.C. 2009); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991*)*; *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000).

[8]    The February 6, 2014, Memorandum Opinion (Dkt. 39) is cited as "Feb. Op."

outset, and was unable to make a financial offer acceptable to the WMATA board.").

On July 21, 2011, WMATA sold the Florida Avenue properties to JBG Associates, an unrelated third-party developer. Compl. ¶ 180 (JA0055-56).

## II.    PROCEDURAL HISTORY

### A.    Banneker's Complaint

On March 25, 2013, Banneker filed this lawsuit asserting claims against WMATA, Graham, and LAD (collectively, "Defendants"). On June 27, 2013, Banneker filed an amended complaint. Despite its volume, the Complaint contained largely conclusory, repetitive allegations. As the district court correctly concluded, the specific factual allegations Banneker made did not establish that Defendants' conduct affected Banneker's failure to reach a deal with WMATA.

The Complaint asserted the following eight claims: Count I (Breach of Contract) and Count II (Breach of Implied Covenant of Good Faith and Fair Dealing) against WMATA; Count III (Tortious Interference with Prospective Economic Advantage) and Count IV (Tortious Interference with Contract) against Graham and LAD; Count V (Unjust Enrichment) against WMATA; Count VI (Unlawful Restraint of Commerce) against Graham and LAD; Count VII (Fraud) against WMATA; and Count VIII (Civil Conspiracy) against all Defendants.

The Complaint alleged WMATA breached the Term Sheet by failing to negotiate exclusively and in good faith with Banneker toward a Definitive Agreement.  Compl. ¶¶ 205, 208, 211, 222 (JA0063-66, 0068).[9]  The Complaint, however, acknowledged that WMATA extended Banneker's exclusivity period *three times* for fifteen *additional* months, and failed to present a single allegation that, during that period, WMATA engaged in negotiations with LAD or any other party.  *Id.* ¶¶ 3, 141, 164, 212, 329 (JA0012, 0047, 0052, 0066, 00107).  Banneker also asserted that WMATA committed fraud because it agreed to negotiate with Banneker while knowing it would never enter into a Definitive Agreement. App. Br. 56.

As to Graham, the Complaint alleged that, while acting within the scope of his official duties as a Board member, Compl. ¶¶ 17, 20 (JA0017), he thwarted Banneker's negotiations with WMATA staff and caused the Board to reject a final agreement with Banneker.  *Id.* ¶¶ 247, 275 (JA0077-79, 0085-87).  However, the Complaint did not allege how any of Graham's purported actions actually thwarted negotiations between WMATA staff and Banneker.  Nor did the Complaint allege how Graham purportedly caused the Board to vote against entering a final agreement.  Instead, the Complaint conceded that "protracted" negotiations

---

[9]    The Complaint also asserted that WMATA breached the Term Sheet because it failed to execute a Definitive Agreement for the conveyance and development of the Site.   Compl. ¶¶ 210-229 (JA0066-71).  Banneker appears to have abandoned this claim on appeal.

continued between Banneker and WMATA staff over a twenty-month period and resulted in a final staff recommendation that the Board members were free to, and did, unanimously reject. *Id.* ¶¶ 3, 166-167 (JA0012, 0052). Moreover, the majority of Banneker's allegations regarding Graham occurred before the execution of the Term Sheet and commencement of exclusive negotiations between Banneker and WMATA in July 2008. *Id.* ¶¶ 27, 35, 40, 43, 46, 48, 60-62, 64-67, 70-75, 76-77, 80-83, 88-94, 96-98, 100, 102-112 (JA0019, 0021-23, 0025-39).

The allegations against LAD were extremely sparse. First, Banneker asserted that LAD telephoned WMATA staff every few months during Banneker's exclusive negotiation period to express LAD's continuing interest in the Site and to disparage Banneker. Compl. ¶¶ 262, 272 (JA0082, 0085). The Complaint did not state what was supposedly communicated or that it was false, and maintained that, after the calls, WMATA staff continued to negotiate with Banneker and recommended approval of an agreement. *Id.* ¶¶ 159, 161, 165-166 (JA0051-52). Second, Banneker generically alleged that LAD "used their relationship with Graham to induce Graham and WMATA's staff and Board to breach its contract to negotiate exclusively with Banneker." *Id.* ¶ 270 (JA0084); *see id.* ¶¶ 317-318, 320-322 (JA00103-05). Banneker never identified how LAD influenced Graham or WMATA, and failed to explain how, if LAD had such influence, LAD lost the renewed solicitation that WMATA issued after Banneker's negotiation rights

14

expired. Third, Banneker alleged that, in 2008, after the Term Sheet was signed, LAD purportedly tried to sell Banneker the right to ground lease an adjacent parcel. *Id.* ¶¶ 71, 73-75, 84, 86-87, 113, 119, 125, 246, 247(5), 275(5) (JA0028-29, 0032-33, 0040-42, 0076-77, 0085-86), or alternatively, played some unspecified role in an effort by Graham to persuade Banneker to include LAD on its development team. *Id.* ¶¶ 70, 111-112, 131-135, 247(4), 256, 259, 271, 275(4) (JA0027-28, 0039, 0044-45, 0077, 0080-81, 0084-86). The Complaint did not explain how these purported overtures—which sought to capitalize on Banneker's negotiations, not interfere with them—harmed Banneker.

### B.     Rulings Below

On July 29, 2013, Defendants moved to dismiss the Complaint. Banneker filed oppositions to all three motions. On December 11, 2013, the district court granted WMATA's motion, dismissing the unjust enrichment, fraud and conspiracy claims (Counts V, VII, and VIII) on the basis of sovereign immunity and the breach of contract and implied covenant claims (Counts I and II) for failure to state a claim. Dec. Op. 17, 18, 24 (JA00219-20, 00226). In addressing sovereign immunity, the district court concluded that WMATA's actions were discretionary and grounded in social, economic or political goals. *Id.* at 16-17 (JA00218-19). The district court dismissed Counts I and II because the Complaint "d[id] not allege that WMATA negotiated with another developer for development

15

of the project during Banneker's exclusivity period," and because Banneker had not alleged an enforceable contract to develop the Site. *Id.* at 21-22 (JA00223-24).

On February 6, 2014, the district court granted Graham and LAD's motions. As to Graham, the district court first concluded that all claims against him in his official capacity were barred by sovereign immunity because the critical decisions Banneker challenged were discretionary and, thus, "treated as claims against WMATA and the District." Feb. Op. 13 (JA00243). The district court further held that all claims against Graham in his personal capacity were barred by absolute immunity because, again, Graham's actions were discretionary and "related to his duties as a member of the WMATA Board of Directors." *Id.* at 19 (JA00249).

The district court also dismissed the tortious interference, unlawful restraint of commerce, and civil conspiracy claims against Graham and LAD under Rule 12(b)(6). Feb. Op. 19-26 (JA00249-56). As to tortious interference with prospective economic advantage, the district court concluded that Banneker failed to allege a valid business expectancy because Banneker's expectancy was "dependent upon approval by government bodies" and was "too remote" to be cognizable. *Id.* at 20-21 (citations omitted) (JA00250-51). In addition, the court concluded that Banneker failed to allege that the claimed interference "actually caused termination of the business relationship/expectancy or actually caused a failure of performance by WMATA." *Id.* at 21 (JA00251). Specifically, because

16

LAD had no "power or authority to cause the WMATA Board to vote," the court found they were incapable of causing Banneker to lose any expectancy. *Id.*

As to tortious interference with contract, the district court addressed two different theories—one based on an alleged contract to develop the Site and another based on an alleged contract to negotiate for the development of the Site. As to the first, consistent with its December 2013 opinion, the district court concluded that there was no tortious interference claim because there was no enforceable development contract. *Id.* at 22-23 (JA00252-53). As to the second, it held that there was no interference claim because Banneker failed to allege that the exclusivity period was terminated prematurely or that WMATA negotiated with anyone besides Banneker. *Id.* at 23 (JA00253).

Finally, the district court dismissed the conspiracy claim because it was based on the dismissed tort claims. *Id.* at 25-26 (JA00255-56).

### C.  Appeal

On March 7, 2014, Banneker filed a timely notice of appeal. Banneker challenges the district court's finding of sovereign immunity as to the fraud claim against WMATA, its finding of absolute immunity as to the claims against Graham, and its Rule 12(b)(6) dismissal of the breach of contract and duty of good faith and fair dealings claims against WMATA (Counts I and II) and the tortious

interference and conspiracy claims against Graham and LAD (Counts III, IV, and VIII).

## SUMMARY OF ARGUMENT

Banneker cannot sustain its claim for breach of contract (Count I). The Complaint failed to allege that WMATA breached the Term Sheet's five-month exclusive negotiation provision or that the Term Sheet was an enforceable preliminary agreement to develop the Site. WMATA tirelessly negotiated with Banneker—and *only* Banneker. Moreover, the express language of the Term Sheet unequivocally *disclaimed* any binding obligation to develop the Site.

Banneker cannot sustain a claim for breach of the implied covenant of good faith and fair dealing (Count II). Count II did nothing more than assert the same insufficient facts alleged in support of Banneker's contract claim—namely, that WMATA breached the Term Sheet. Such a duplicative claim is not recognized as a separate cause of action and Banneker's allegations otherwise showed it received exactly what it was entitled to under the Term Sheet.

Because WMATA engaged in discretionary conduct when it negotiated with Banneker regarding the development of real estate, the district court correctly held that WMATA had sovereign immunity from Banneker's fraud claim (Count VII).

The district court correctly held that absolute immunity barred all claims against Graham. Banneker itself alleged that Graham acted within the scope of his

18

official duties at all times relevant to Banneker's claims. Moreover, Graham's alleged acts were discretionary because no statute, regulation, or policy specifically prescribed them and because they were grounded in the social, economic, and political goal of ensuring that a sufficiently experienced and financially capable developer was chosen for the project.

The district court correctly dismissed Banneker's tortious interference with prospective economic advantage claim (Count III) for numerous reasons. First, there were too many contingencies affecting consummation of a final agreement for Banneker to have had a valid business expectancy. Second, Banneker failed to adequately allege intentional interference causing termination of any expectancy. It conceded below that the Complaint did not allege causation, and it otherwise (i) did not plausibly allege that either Graham or LAD was capable of causing, or in fact caused, WMATA to deprive Banneker of an expectancy; and (ii) did not plead that LAD engaged in the kind of egregious misconduct required to establish intentional interference by a competitor.

The district court correctly dismissed Banneker's tortious interference with contract claim (Count IV) for similar reasons. The Complaint did not adequately allege that Graham or LAD was capable of causing, or in fact caused, WMATA to breach any contract or that LAD's supposed conduct met the heightened standard for establishing intentional interference by a competitor.

19

The district court correctly dismissed Count VIII (conspiracy) because all of Banneker's underlying tort claims fail.

The *Noerr-Pennington* doctrine requires dismissal of all claims against LAD because each claim relied exclusively on allegations that LAD petitioned government officials to advance their own interests in developing the Site.

## ARGUMENT

## I.   THE DISTRICT COURT PROPERLY DISMISSED COUNT I.

Banneker asserted that WMATA breached Section 12 of the Term Sheet obligating WMATA to negotiate exclusively with Banneker for the opportunity to develop the Site.   Compl. ¶¶ 205, 208, 211 (JA0063-66).   That is the theory Banneker still advances on appeal.   App. Br. 21-23.   To maintain its claim, Banneker had to allege facts sufficient to satisfy the following elements: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; [and] (4) damages caused by the breach." *Paulin v. George Washington Univ.*, 878 F. Supp. 2d 241, 246 (D.D.C. 2012) (internal quotations and citations omitted).

The district court properly dismissed Banneker's contract-to-negotiate claim on the ground that Banneker did not plead facts sufficient to sustain the third element—breach of the obligation to negotiate exclusively with Banneker.   Dec. Op. 24 (JA00226).

20

Banneker also alleged that WMATA breached the Term Sheet a second way—by failing to enter into a Definitive Agreement for the conveyance and development of the Site.  Compl. ¶¶ 210-229 (JA0066-71).  Banneker appears to have abandoned this claim on appeal in light of the district court's unassailable ruling that the Term Sheet was not a binding contract reflecting agreement on all material terms.  Dec. Op. 22 (JA00224).  However, if Banneker's heavy reliance on *Stanford Hotels Corp. v. Potomac Creek Assocs.*, 18 A.3d 725 (D.C. 2011) ("*Stanford*"), suggests it has not abandoned this claim, this Court should affirm the district court's decision.

### A.     <u>Banneker Failed to Allege a Breach of the Term Sheet's Exclusive Negotiation Provision.</u>

The district court determined that the Complaint failed to allege a breach of WMATA's obligation to negotiate exclusively with Banneker because Banneker did not allege either that the exclusivity period was terminated early or that WMATA negotiated with LAD or any other party during that period.  Dec. Op. 21 (JA00223); Feb. Op. 23 (JA00253).  This was doubtlessly correct.  The Complaint acknowledged that, while under no obligation to do so, WMATA extended Banneker's negotiation period on three occasions for fifteen months beyond the original five-month period.  Compl. ¶¶ 3, 141, 164, 212, 329 (JA0012, 0047, 0052, 0066, 00107).  Moreover, the Complaint was filled with details of the "protracted negotiations" that WMATA undertook with Banneker—and only Banneker—

21

between June 2008 and March 2010. *Id.* ¶¶ 3, 118, 123-124, 126, 136, 138, 141, 143-146, 151-152, 157-158, 164-166 (JA0012, 0040-43, 0045-52). These meaningful and "protracted" negotiations over the course of twenty months failed not because WMATA did not engage with Banneker, but because the parties "confronted numerous obstacles to finalizing a term sheet," including Banneker's inability to retain an experienced development partner or offer an acceptable price. Dec. Op. 4-5 (JA00206-07). Banneker's own allegations demonstrate the implausibility of its conclusory assertion that WMATA did not negotiate in good faith.

Similarly implausible is Banneker's allegation that WMATA "negotiated" with LAD during Banneker's exclusivity period. The Complaint averred only that LAD called WMATA staff to promote itself and disparage Banneker. Compl. ¶¶ 133, 272 (JA0045, 0085). The Complaint did not characterize WMATA's mere receipt of these purported calls as a "negotiation." *Id.* ¶¶ 133-135 (JA0045). Nor can the mere receipt of telephone calls, even where they supposedly self-promotes and disparages others, credibly be construed as a "negotiation." The district court correctly found that the Complaint was devoid of allegations that WMATA negotiated with anyone except Banneker during the exclusivity period. Dec. Op. 21-22 (JA00223-24).

Banneker nonetheless asserts that, under *Stanford*, the district court was

wrong to find no breach. App. Br. 23-26. But Banneker's argument under *Stanford* is inconsistent with the express language of the Term Sheet and Banneker's own allegations.

*Stanford* involved negotiations between a buyer and seller relating to the purchase of a hotel under a preliminary agreement between the parties. 18 A.3d at 728-29. The preliminary agreement had "obligated [the parties] to negotiate exclusively and in good faith . . . *and to sign* a Definitive Agreement if they were able to agree on terms." *Id*. at 734. The court concluded that the seller breached the agreement because it: (i) abandoned negotiations with the plaintiff by ceasing direct communications with it from late December 1997 through early March 1998; (ii) simultaneously negotiated an alternative transaction with a third party that would preclude the sale of the hotel to the plaintiff; and (iii) refused to countersign the Definitive Agreement that the seller itself had sent to the plaintiff for execution "*after all its terms had been agreed upon*." *Id*. at 731, 733-35 (emphasis added).

*Stanford* is nothing like this case. *Stanford* did not involve a stand-alone promise to negotiate like the one Banneker seeks to enforce. Rather, as the court emphasized, the preliminary agreement in *Stanford* "unusually" obligated the parties to sign the Definitive Agreement once they resolved its terms, and the parties in fact reached agreement on all material terms. *Id*. at 738. Here, the Term

Sheet did not obligate the negotiating parties to sign a Definitive Agreement once an agreement was reached; to the contrary, it expressly *prohibited* the establishment of a binding Definitive Agreement "unless and until" WMATA's Board approved one.  Term Sheet § 8.4 (JA00117).  Moreover, unlike in *Stanford*, the parties did not come close to reaching agreement on all material terms.

Additionally, as explained above, WMATA was not like the seller in *Stanford,* as it did not abandon its negotiations with Banneker during Banneker's exclusivity period. Rather, as the district court correctly held, "the Amended Complaint d[id] not allege that the exclusivity period was terminated prematurely." Feb. Op. 23 (JA00253).   In fact, the Board chose not to "abandon" negotiations when it had the indisputable right to do so.  WMATA could have ceased to negotiate when the Term Sheet's negotiation period ended in December 2008, but instead chose to extend Banneker's negotiation period three times. Compl. ¶¶ 137, 141, 164 (JA0046-47, 0052).  Banneker's suggestion that LAD's unsolicited phone calls to WMATA staff were a "negotiation" comparable to the seller's third party negotiations in *Stanford* is equally spurious.  *See* App. Br. 22-23.  In *Stanford*, the seller actively negotiated with a third party by authorizing the third party to submit a proposal for the sale and refinance of the same property that was the subject of the seller's preliminary agreement with the plaintiff.  18 A.3d at 731.  WMATA

24

did not similarly negotiate with LAD or any other third party during Banneker's exclusivity period.

*Stanford* is thus inapposite.  The district court properly held that, unlike the seller in *Stanford,* WMATA did not breach any obligation to negotiate exclusively with Banneker.

### B.    To the Extent Banneker Still Claims Breach of an Agreement to Develop the Site, the District Court Properly Dismissed that Claim.

Even if Banneker's heavy reliance on *Stanford* means it has not abandoned its claim that the parties were contractually bound to *execute* a Definitive Agreement, the district court's dismissal of that claim should be affirmed.[10]  The district court's determination that the Term Sheet exhibited neither an intent to be bound nor an agreement on all material terms is unassailable.  Dec. Op. 22 (JA00224).  By its plain terms, the Term Sheet *disclaimed* any binding obligation to develop the Site, and the parties remained miles apart on key provisions, including price and participation of an experienced development partner.  *Id*. at 23-24 (JA00225-26).

Consistent with the district court's decision, the Term Sheet did not come close to passing the test for a binding Type II preliminary agreement to develop the

---

[10]    Notably, in *Stanford*, the defendant did not dispute that the parties' preliminary agreement was a binding Type II preliminary agreement.

Site under *Teachers Insurance & Annuity Ass'n. v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987) ("*Teachers*").[11]    Under *Teachers*, a court should consider the following factors in determining whether a preliminary agreement is enforceable:   "whether the intent to be bound was revealed by (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions."   *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir. 1989) (adopting *Teachers*).   The Complaint did not establish that the Term Sheet satisfied any of these factors.

*Language of Agreement.*   Under Section 12 of the Term Sheet, WMATA and Banneker agreed that the Term Sheet was non-binding and that the parties would not be bound until a Definitive Agreement was both executed and approved by the Board.   Term Sheet §§ 8.4, 12 (JA00117, 00121); Dec. Op. 23 (JA00225); *see also* JDS §§ 1.7, 1.10, 3.3.C., 3.3.D., 5.2.A. (JA00122, 00130-31, 00134).

----

[11]     In addition to abandoning its claim that WMATA breached its obligation to memorialize a Definitive Agreement, Banneker failed to respond to the *Teachers*-Type II agreement analysis set forth in both WMATA's and LAD's motions to dismiss. WMATA Mot. to Dismiss (Dkt. 22-1) at 20-24; LAD Mot. to Dismiss (Dkt. 20-1) at 6 (incorporating the arguments set forth in LAD's Mot. to Dismiss (Dkt. 16-1) at 15-20).   Therefore, Banneker conceded that the Term Sheet was *not* a binding "Type II" contract. *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries,* 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (internal citation omitted).

*Context*.   Establishing the context of Banneker's negotiations with WMATA, the Solicitation clearly put Banneker on notice that neither Banneker's status as the Selected Developer nor the Term Sheet "constitute[d] a binding obligation or commitment by WMATA."   JDS § 1.7 (JA00122); *see also* JDS §§ 3.3.C., 5.2.A, 5.2.J. (JA00130, 00134-35).

*Open Terms*.   The Complaint demonstrated that both parties considered many of the material provisions of the Term Sheet to be "open terms," including price, affordable housing requirements, inclusion of adjacent parcels and even the structure of the deal (lease or sale).   Compl. ¶¶ 123, 144, 157, 164, 165 (JA0042, 0047, 0050, 0052).

*Partial Performance*.   Banneker has not alleged partial performance.   The fact that Banneker might have incurred certain, expected costs during the negotiation period is immaterial because the Solicitation and the Term Sheet made clear that Banneker did so "at its own risk." JDS §1.9 (JA00122); Term Sheet § 12 (JA00121).

*The Custom of Putting Agreements in Final Form*.   A complex, multi-million dollar real estate transaction like the one in this case is customarily reduced to a final written document before becoming enforceable.   *Novecon Ltd. v. Bulgarian-Am. Enter. Fund*, 190 F.3d 556, 564-65 (D.C. Cir. 1999).

27

The Term Sheet, in short, was not a binding Type II preliminary agreement for the conveyance and development of the Site.

## II. THE DISTRICT COURT PROPERLY DISMISSED COUNT II.[12]

### A. Count II is Not an Independent Cause of Action.

As the district court correctly noted, Banneker's claim for breach of the implied covenant of good faith and fair dealing asserts the same facts to make the same grievance as its breach of contract claim—namely, that WMATA breached Section 12 of the Term Sheet.  Dec. Op. 20 (JA00222); *cf.* Compl. ¶¶ 208, 227, 238-239 (JA0063-65, 0069-71, 0073-75).  Because claims for breach of the duty of good faith and fair dealing are not independent causes of action where, as here, they rest on the alleged violation of a contractual provision, the district court properly dismissed Count II.  *See WMATA v. Quik Serve Foods, Inc.*, Nos. 04-838(RCL); 04-687(RCL), 2006 WL 1147933, at *5 (D.D.C. Apr. 28, 2006)

### B. Banneker Failed to Allege the Elements to Establish an Implied Covenant of Good Faith and Fair Dealing Claim.

"[T]he implied covenant may not override the express provisions of the contract."  *Id.*  Here, as set forth above, WMATA complied with the express provision of the Term Sheet obligating it to negotiate exclusively with Banneker

---

[12]    Banneker claims that the district court erred in dismissing Count II to the extent it relied on the Bondi Report.  App. Br. 28-29.  Although the Bondi Report was clearly incorporated into the Complaint, Dec. Op. 9 (JA00211), the district court never relied on it in dismissing Count II.  *Id*. at 18-24 (JA00220-26).

until the termination of the exclusivity period. Indeed, the Board extended that period on three occasions, even though it was under no obligation to do so, and engaged in substantive and protracted negotiations for the duration. Compl. ¶¶ 3, 141, 164, 212, 329 (JA0012, 0047, 0052, 0066, 00107); JDS § 3.3.C. (JA00130). Banneker got what it was entitled to under the Term Sheet—and more. It thus had no claim for breach of the duty of good faith and fair dealing.

## III.    THE DISTRICT COURT PROPERLY DISMISSED COUNT VII.

The district court properly dismissed the fraud claim against WMATA because the actions WMATA undertook here were discretionary acts for which it enjoys sovereign immunity under Section 80 of the Compact.[13]  Dec. Op. 11 (JA00213).   Moreover, even if Banneker did not enjoy sovereign immunity, Banneker's allegations of fraud were not pled with the particularity required by Rule 9(b) and failed to state a claim under Rule 12(b)(6) because (1) the fraud claim duplicated its contract claim in violation of D.C. law; and (2) Banneker failed to plead the essential elements required under D.C. law to state a claim for fraudulent misrepresentation.

---

[13]    Banneker referenced alternative claims for negligent misrepresentation and constructive fraud.  Compl. ¶ 310 (JA00102).  Banneker has forfeited its right to have these alternative claims reviewed on appeal because it failed to raise them in its brief.  *Williams v. Romarm, SA*, 756 F.3d 777, 782-83 (D.C. Cir. 2014).

### A.     Count VII Is Barred by WMATA's Sovereign Immunity.

Banneker correctly recognized that, because WMATA's actions at issue are not quintessentially governmental, WMATA's entitlement to sovereign immunity turns on whether WMATA's actions were "discretionary" as opposed to ministerial.  App. Br. 56.

The district court correctly recognized that Banneker failed to cite to any regulation, statute, or policy that dictates WMATA's actions in negotiating a real estate development contract and would thus render such actions ministerial, *i.e.*, decisions by its Board on what the terms of a real estate deal should be and whether further negotiation extensions should be granted.   Dec. Op. 14 (JA00216).[14]  On appeal, Banneker still fails to do so.  Instead, Banneker tries to avoid dismissal by asserting that "[t]o the extent WMATA's agents . . . were aware of Graham's misconduct and decided to actively assist Graham in the violation of his duties, those agents also breached a policy that 'specifically directs WMATA's conduct' for sovereign immunity purposes."[15] App. Br. 60.  This argument is

---

[14]     The Court need not examine whether WMATA's discretionary conduct in this case was founded on social, economic or political considerations because Banneker has conceded this point.  Dec. Op. 17 (JA00219); *see Williams,* 756 F.3d at 783.   In any event, WMATA's conduct implicates all three, particularly economic and social, considerations.

[15]     Banneker has not challenged, and thus has conceded, the district court's holding that Graham enjoys sovereign immunity as a WMATA Board member.

fatally flawed.  First, Banneker fails to name any individuals who might have known of Graham's alleged misconduct or assisted him in any way.  Second, Banneker fails to identify this purported "policy" that prescribes a course of action for WMATA's agents and thereby renders their conduct non-discretionary. Therefore, it has provided <u>zero</u> support for its argument that WMATA's sovereign immunity is waived as to fraud.  To the extent Banneker's "policy" reference is referring to WMATA's Standards of Conduct, the district court properly rejected that argument, finding that "[t]he Standards of Conduct do not compel a WMATA Board member to take any particular action with regard to a real estate deal."  Feb. Op. 14 (JA00244).  In its briefing, Banneker has not offered any authority or argument to refute the district court's holding.  Moreover, if Banneker is referring to the Procedures for WMATA's Board of Directors, which forbid a Board member from directing or supervising another employee or contractor, Banneker's argument should be rejected because Banneker has not and cannot explain how such a broad instruction prescribes a specific, non-discretionary course of conduct for WMATA when negotiating a real estate deal.  App. Br. 60.

---

Feb. Op. 13 (JA00243).  Therefore, Banneker's argument that an agent assisting Graham would somehow divest WMATA of its immunity, fails.

## B.     __Banneker Failed to Plead a Sufficient Fraud Claim__.

On appeal, apparently hoping that the Court will glide past the obvious immunity bar to its fraud claim, Banneker focuses its analysis on the sufficiency of its allegations.  But this analysis also lacks merit.  Count VII should be dismissed for each of the following three independent reasons:

### 1.     The Complaint Did Not Plead Fraud with Particularity.

To satisfy Rule 9(b), Banneker had to "allege with particularity matters such as the time, location and content of the alleged misrepresentations, the misrepresented facts, and what was gained or lost as a result of the fraud." *Lee v. Bos*, 874 F. Supp. 2d 3, 6 (D.D.C. 2012).  "Rule 9(b) does not permit a plaintiff to rely . . . on wholly conclusory allegations of fraud, or contentions that [defendant] 'knew or should have known' facts that were supposedly misrepresented or not disclosed.  Rather, it requires a plaintiff accusing a defendant of fraud to set forth specific facts that will support the accusation." *Harris v. Koenig*, 602 F. Supp. 2d 39, 53 (D.D.C. 2009) (internal quotations and citation omitted).

Banneker's allegations were plainly inadequate.[16]  Banneker alleged that WMATA falsely misrepresented that it could reach a final agreement with

---

[16]     Banneker blames its pleading failure on the fact that it "has yet to discover all pertinent facts and evidence."  App. Br. 56.  However, this does not excuse Banneker from complying with Rule 9(b): "Rule 9(b) . . . attempts in part to prevent[] the filing of a complaint as a pretext for the discovery of unknown

WMATA because "'WMATA either *knew or should have known* that Graham had embarked upon a continuous, aggressive, and egregious course of misconduct to prevent Banneker from enjoying the period of exclusivity' or from entering a final JDA." App. Br. 58 (emphasis added). This is exactly the type of conclusory allegation that Rule 9(b) prohibits. Banneker did not allege a single fact that reflected: (i) who knew or should have known of Graham's misconduct, (ii) why, assuming the allegations of Graham's misconduct were true, WMATA would or should have known a deal would never be reached given that the Board, as a collective whole, and not Graham, as a single Board member with a single vote, had the authority to approve or reject a final agreement;[17] or (iii) what possible benefit WMATA could derive from engaging in a two-year negotiation while knowing it would "never" enter into a binding agreement.

Moreover, Banneker's own allegations contradicted its theory that Graham's actions were a "clear sign to staff that negotiations would be in vain . . .," App. Br. 58, because it acknowledges that the Board, as a collective body, voted to approve the Term Sheet and several extensions of the exclusive negotiation period in spite

---

wrongs." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994) (internal citations and quotations omitted).

[17] Banneker acknowledges that "[t]he authority of the Board of Directors is vested in the collective body and not in its individual members." App. Br. 47, n.7; *see also* D.C. Code § 9-1107.01(8).

of both Graham's abstention from those votes and despite alleged attempts to thwart the deal.  Compl. ¶¶ 90, 141, 164 (JA0034, 0047, 0052).

Banneker's conclusory allegations did not provide sufficient information to put WMATA on notice of specific conduct that purportedly amounted to fraud.

### 2.    The Fraud Claim Was Duplicative of Banneker's Contract Claim.

District of Columbia law requires that:

> [T]he factual basis for a fraud claim be separate from any breach of contract claim that may be asserted. . . . [C]onduct occurring during the course of a contract dispute may be the subject of a fraudulent . . . misrepresentation claim when there are facts separable from the terms of the contract upon which the tort may independently rest and when there is a duty independent of that arising out of the contract itself, so that an action for breach of contract would reach none of the damages suffered by the tort.

*Plesha v. Ferguson*, 725 F. Supp. 2d 106, 113 (D.D.C. 2010) (internal quotations and citations omitted).   Banneker's fraud claim was based upon the same allegations as its breach of contract claim—namely, WMATA's alleged failure to negotiate exclusively with Banneker.  Because the fraud and contract claims were duplicative, the fraud claim should be dismissed.

### 3.    The Complaint Failed to Plead the Elements of Fraud.

Banneker correctly recites the elements of fraud.  App. Br. 56-57.  However, its Complaint did not satisfy the first element—false representation—because all

that Banneker attributed to WMATA was a statement (a promise) of a future event, which does not support a fraud claim.

"[A]n action based on fraud can only be predicated on misrepresentation of past or existing fact; breach of future promises lies in the realm of the contract." *One-O-One Enterprises, Inc. v. Caruso*, 668 F. Supp. 693, 699 (D.D.C. 1987) (internal quotations omitted). None of the representations Banneker attributed to WMATA—*i.e.,* providing Banneker an exclusive negotiation period and informing "Banneker that it expected to finalize a joint development agreement by October 2008 in time for the Board to approve it at the December 2008 Board meeting. . . ."—constituted the kind of misrepresentations required to support a fraud claim. Compl. ¶¶ 301-302 (JA0097-98). These were promises to engage in future conduct, not representations of a past or present fact. In other words, Banneker's fraud claim was nothing more than a restatement of its contract claim. The Complaint thus failed to satisfy the first element of a claim for fraud.

## IV. THE DISTRICT COURT PROPERLY CONCLUDED THAT ABSOLUTE IMMUNITY BARS SUIT AGAINST GRAHAM.

A government official is absolutely immune from suit "if the conduct at issue falls '[(1)] within the scope of their official duties *and* [(2)] the conduct is discretionary in nature.'" *Beebe v. WMATA*, 129 F.3d 1283, 1289 (D.C. Cir. 1997) (quoting *Westfall v. Erwin*, 484 U.S. 292, 297-98 (1988)).

The district court properly held that Graham—a Board member and elected official—was entitled to absolute immunity because his "alleged conduct regarding Banneker and the negotiation of the proposed development contract was related to the general matters committed to his control and supervision," Feb. Op. 19 (JA00249), and because he "exercised discretion in deciding whether, and on what terms, to vote for a final contract with Banneker." *Id.* at 15 (JA00245).

### A.    Graham Acted Within the Scope of His Official Duties.

Banneker has consistently alleged and argued that Graham acted *within* the scope of his employment as a Board member:

- "WMATA employees (including its Board Members) were acting within the course and scope of their employment or as agents of WMATA."  Compl. ¶ 17 (JA0017).

- "Graham was acting within the course and scope of his employment while he was performing his ministerial duties. . . ."  Compl. ¶ 328 (JA00107).

- "Graham Was Acting within the Scope of Employment When the Torts were Committed."  Banneker Opp. to Graham Mot. to Dismiss (Dkt. 25) at 23; Opp'n to Graham Mot. For Summ. Aff. 21.

- "[I]t is clear that WMATA agent Graham was, at all times relevant hereto, acting within the scope of his employment as a member of the WMATA

Board of Directors."  Banneker Opp. to Graham Mot. to Dismiss (Dkt. 25) at 23.

On appeal, Banneker contradicts both its Complaint and its consistent litigation position.  Banneker now argues that Graham failed to prove he was acting within the scope of his employment, a fact that *Banneker itself repeatedly and consistently alleged*.

To clear the jurisdictional hurdle of absolute immunity, a plaintiff must allege in the first instance that the defendant acted outside of the scope of his official duties.  *Beebe*, 129 F.3d at 1289.  Because Banneker—like the plaintiff in *Beebe*—failed to allege that Graham acted outside the scope of his official duties, Banneker's argument should be rejected.

Even if Banneker's new argument could be entertained at this point, it would fail.  The district court found that "[f]or an act to come within official duties, it only needs to fall within the 'outer perimeter' of official duties; to come within such 'outer perimeter,' it need only be 'related more or less' to the general matters committed by law to the officer's control and supervision."  Feb. Op. 18 (JA00248) (citing *Minch v. District of Columbia*, 952 A.2d 929, 939 (D.C. 2008)). There is no serious disagreement that Graham's conduct "related 'more or less'" to his consideration of and voting on Banneker's proposal.

37

Banneker ignores this controlling standard, and instead advances another new argument, namely that Graham acted outside the scope of his duties because he deviated from the Board's internal procedures, which include the following clause: "No member individually shall direct or supervise the General Manager or any WMATA employee or contractor."  App. Br. 47, n.7.  Of course, as the Bondi Report explained, these "[p]rocedures *did not* prohibit individual Metro Board Members from meeting or consulting with Metro staff or developers."  Bondi Report 4 (JA00144) (emphasis added).  Nevertheless, Banneker insists that, because WMATA's internal rules and procedures precluded Graham from directing or supervising WMATA employees, any allegation that Graham engaged in such conduct establishes that he was *per se* acting outside the scope of his official duties.

This Court has never come close to adopting Banneker's approach. Although this Court previously has held that officials "exceed the outer perimeters of their responsibilities" when they "resort to physical force to compel the obedience of their managerial subordinates," *McKinney v. Whitfield*, 736 F.2d 766, 771-72 (D.C. Cir. 1984), it further suggested that absolute immunity would attach in less extreme circumstances not involving battery, noting that it is "evident that compelling federal officials to defend suits alleging heated discussion and threatening gesture would place a noticeably greater damper on the exercise of

supervisory discretion than merely holding such officials accountable for physical intrusions." *Id.* at 770, n.17.

Nothing Banneker alleged against Graham was remotely as egregious or attenuated to official duties as the false imprisonment and physical violence directed against a subordinate in *McKinney*, or the false threats of criminal process against a subordinate alleged in *Bishop v. Tice*, 622 F.2d 349, 359 (8th Cir. 1980), both of which Banneker relies upon. Instead, "[t]he actions allegedly taken by Mr. Graham, such as seeking to include LAD as a member of the development team for the Project and adding an affordable housing requirement to the Project, were done as part of Mr. Graham's involvement, as a WMATA Board Member and as a PDRE Committee Member, in setting contract terms for the development of the Site." Feb. Op. 18-19 (JA00248-49).

Board members have statutory authority to vote on proposed actions related to WMATA's authority to acquire, own, and convey property and to enter into and perform contracts, leases, and agreements. It would have a significant deleterious effect on the effective administration of government if a Board member risked legal jeopardy based on interactions with WMATA staff that could be characterized *ex post facto* as supervision or direction, including information-gathering and other ministerial tasks. *See Westfall*, 484 U.S. at 295 ("The provision of immunity rests on the view that the threat of liability will make

federal officials unduly timid in carrying out their official duties, and that effective government will be promoted if officials are freed of the costs of vexatious and often frivolous damages suits.").  Even if the Board member acts strenuously or with allegedly impure intentions, "[a]bsolute immunity bars all suits 'attacking conduct within the scope of the immunity, even if the official is alleged to have acted in bad faith.'"  Feb. Op. 16 (JA00246) (quoting *Gray v. Poole*, 243 F.3d 572, 575 (D.C. Cir. 2001)).

Given the absence of any allegation that Graham acted beyond the outer perimeter of his official duties—let alone that he engaged in physical violence or falsely threatened criminal sanctions—this Court should sustain the district court's determination Graham's alleged actions "related more or less" to his official duties and that he therefore acted within the scope of those duties.

### B.  <u>Graham's Conduct Was Discretionary.</u>

The district court correctly held that Graham "exercised discretion in deciding whether to vote for an extension of Banneker's exclusivity period; he exercised discretion in deciding whether, and on what terms, to vote for a final contract with Banneker."  Feb. Op. 15 (JA00245).  On appeal, Banneker does not dispute that holding.  Rather, Banneker contends that the district court failed to determine whether "all of the actual acts of interference were discretionary acts." App. Br. 52.  According to Banneker, Graham's alleged actions were not

40

discretionary because they purportedly violated WMATA's internal standards of conduct.

This Court has adopted a two-part test to determine whether an official's conduct is discretionary: (1) "whether any statute, regulation, or policy specifically prescribes a course of action for an employee to follow" and, if not, (2) "whether the exercise of discretion is grounded in social, economic, or political goals." *KiSKA Constr. Corp. v. WMATA*, 321 F.3d 1151, 1159 (D.C. Cir. 2003).

Below "Banneker point[ed] to no statute, regulation or policy specifying WMATA's actions in negotiating a real estate development contract," Dec. Op. 14 (JA00216), and it does not do so on appeal.  Instead, Banneker puts forward WMATA's internal standards of conduct, claiming that they somehow "prescribed" a course of action for Graham to follow because they "prohibited him from showing favoritism, from soliciting anything of value in return for official conduct, from leaking confidential bid information, and from otherwise acting under a conflict of interest." App Br. 52.  Banneker offers no substantive response to the district court's observation that "[t]he Standards of Conduct do not compel a WMATA Board Member to take any particular action with regard to a real estate deal," and that "[i]n fact, the WMATA Standards of Conduct describe how *not* to act, not how *to* act."  Feb. Op. 14 (JA00244).

As this Court recognized in *KiSKA*, the operative inquiry is not whether the governing statutes and regulations prohibit certain conduct, but whether they "leave room for the exercise of discretion." 321 F.3d at 1159 (citation omitted). Regardless of what the WMATA standards of conduct may have prohibited, Banneker cannot reasonably contend that they did not "leave room for the exercise of discretion."

With respect to the second inquiry, whether Graham's "exercise of discretion is grounded in social, economic, or political goals," the district court correctly noted that Banneker conceded this point below. Dec. Op. 17 (JA00219). Banneker now argues for the first time that none of Graham's alleged actions "required Graham to exercise social, political, or economic discretion." App. Br. 54.

Setting aside that Banneker is procedurally barred from advancing this argument, there can be no doubt that the actions Graham took involved making social, economic, and political judgments. On a project that Banneker itself characterized as a "complex, multi-million dollar public-private development," Compl. ¶ 57 (JA0025), Graham had "concerns about Banneker's experience and financial capabilities," Bondi Report 3 (JA00143), and he took steps to address those concerns. Whatever his motives, Graham made the judgment that he would not support Banneker.

42

Ultimately, the Board needed to affirmatively *vote* in support of the development in order for the project to go forward. Even Banneker acknowledged that Graham's vote was quintessentially discretionary. But, Board members have an obligation to learn of relevant facts and determine whether other alternatives exist before making a final determination. In doing so, if Graham's conduct allegedly breached internal protocol, that does not countermand the overarching purpose of absolute immunity: to allow government officials to exercise judgment—even poor judgment—in the course of their official duties, free from second-guessing and judicial interference.

## V. BECAUSE BANNEKER FAILED TO ALLEGE ESSENTIAL ELEMENTS OF TORTIOUS INTERFERENCE, THE DISTRICT COURT'S DISMISSAL OF COUNTS III AND IV SHOULD BE AFFIRMED.

To state a claim for tortious interference, Banneker was required to plead (1) the existence of a contract or valid business expectancy, (2) defendant's knowledge of it, (3) intentional interference causing a breach of the contract or termination of the expectancy, and (4) damages resulting from the breach. *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 325 (D.C. 2008); *Brown v. Carr*, 503 A.2d 1241, 1247 (D.C. 1986).

43

## A.    **The District Court Properly Dismissed Banneker's Claim for Tortious Interference with Prospective Business Advantage (Count III).**

The district court correctly dismissed Count III because Banneker failed to allege *either* a valid business expectancy *or* that Graham or LAD's conduct caused the termination of any such expectancy.  Feb. Op. 19-21 (JA00249-51).

### 1.    **Banneker Did Not Allege the Existence of a Valid Business Expectancy.**

A "valid business expectancy requires a probability of future contractual or economic relationship and not a mere possibility."  *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 60 (D.D.C. 2012) (internal quotations and citation omitted).  For Banneker, there was no such probability; there was only a possibility.  As the district court observed, "Banneker only *hoped* to enter into a final contract with WMATA.  Any final contract was contingent upon approval and execution by the WMATA Board of Directors, a possibility that was too remote to establish a valid business expectancy."  Feb. Op. 21 (JA00251) (citing *Democratic State Comm. of D.C. v. Bebchick*, 706 A.2d 569, 573 (D.C. 1999)) (emphasis added).  In fact, Banneker did not even "*allege[]* that a final contract was 'probable.'"  Feb. Op. 21 (JA00251) (emphasis added).

The district court was doubtlessly correct.  Numerous provisions in the Term Sheet and Solicitation put Banneker on notice that the Term Sheet created no binding obligations and that the WMATA Board retained the discretion to approve

44

or reject any proposed agreement. *See* Term Sheet § 8.4 (JA00117); *id.* § 12 (JA00121) (Term Sheet would have "no binding effect" other than providing Banneker "the exclusive right to negotiate a Definitive Agreement with WMATA for a period of five (5) months," and "[a]ny expenditures" undertaken by Banneker would be "at its own risk"); JDS § 1.7 (JA00122) ("An executed Development Agreement, approved by the WMATA Board of Directors, is the only binding commitment of and by WMATA with respect to a Joint Development Site," and "WMATA's agreement to a Term Sheet or any conduct or oral representations by WMATA shall not in any way constitute a binding obligation or commitment by WMATA"); *id.* § 3.3.D (JA00131). (no binding agreement until Board approves and parties execute final agreement). These provisions undermine any claim that the Complaint plausibly alleged a "probability" of executing a final agreement with WMATA.

Moreover, to get from the Term Sheet to a Definitive Agreement, Banneker had to overcome many hurdles. The Term Sheet contained certain pre-conditions to a Definitive Agreement. For instance, it required Banneker to obtain financing "consistent with the approved development budget" and "satisfactory" to WMATA. Term Sheet § 8.6 (JA00117). It also required Banneker to obtain performance and payment sureties from a third-party guarantor. *Id.* § 9.8 (JA00119). The Complaint did not allege that Banneker satisfied these conditions.

45

Nor did Banneker and WMATA come close to reaching agreement on key material terms.  As the district court found, the non-existence of a valid business expectancy resulted from Banneker's own failures.   Key details remained unresolved, such as Banneker's refusal to make a reasonable financial offer—after the Term Sheet was executed, Banneker slashed its proposal from $14 million to $5.8 million, and then even more—and its inability to find a reliable development partner.  Dec. Op. 4-5 (JA00206-07); Feb. Op. 5, n.6 (JA00235); Bondi Report 5 (JA00145).  As the district court observed, "[a]s Banneker Ventures struggled to resolve these issues, it lost support among Metro Board members."  Feb. Op. 5 n.6 (JA00235) (quoting Bondi Report 5).  This support was indispensable because the Term Sheet made clear that WMATA would not be bound by a Definitive Agreement unless and until the WMATA Board formally approved one.

In short, there were far too many unsatisfied contingencies affecting consummation of a Definitive Agreement for Banneker to have had a valid expectation of securing one.  This fact places this case squarely into the category of cases the district court cited for the proposition that "[a]n expectancy that is dependent upon approval by government bodies ordinarily is considered 'too

remote' to establish a valid business expectancy." Feb. Op. 20  (JA00250) (citing

*Bebchick*, 706 A.2d at 573 and *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978)).[18]

Banneker fails to acknowledge, much less distinguish, this binding case law

from the D.C. Court of Appeals.  Instead, Banneker sets up a straw man, arguing

that the district court incorrectly established a "*per se* rule that an entity can never

have an expectancy in a contract that is subject to approval by a government

Board."  App. Br. 34.  The district court did no such thing.  It stated only that such

an expectancy is "*ordinarily*" too remote, expressly leaving open the possibility

that a plaintiff with a better case might be able to allege a valid expectancy arising

from negotiations with a government agency.  *See* Feb. Op. 20 (JA00250).  The

district court's assertion is consistent with this salient observation from the

principal case on which Banneker relies: "[w]here the ultimate decision to enter

into a business relationship is a highly discretionary decision reposed within . . . a

governmental entity, it becomes more difficult for a plaintiff to prove that it had an

---

[18]    Banneker claimed it had a business expectancy partly because WMATA staff recommended Board approval of a deal and the Board rarely voted contrary to staff recommendations.  App. Br. 34 (citing Compl. ¶ 67).  But whatever Banneker alleged the staff recommended, key material terms of any contract, *e.g.,* price and established developer participation, were still never resolved.  The absence of an agreement on such key provisions defeats any alleged expectancy.

expectancy. . . ." *Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 791 F. Supp. 2d 33, 56 (D.D.C. 2011) (internal quotation and citation omitted).[19]

As the district court determined, it is this difficulty that Banneker could not overcome. Banneker's Complaint did not allege compliance with pre-conditions to a Definitive Agreement and did not establish that crucial deal terms were close to being resolved. Banneker thus failed to demonstrate that it had any reasonable expectation that the WMATA Board would exercise its considerable discretion to approve a final agreement.

---

[19] Banneker's claim that its alleged expectancy was stronger "in all material respects" than Amtrak's in the *Veolia* case is unfounded. App. Br. 35. In *Veolia*, the court held that Amtrak established enough on summary judgment to show that it had a valid expectancy to win a bid to provide commuter rail services. 797 F. Supp. 2d at 57. The court noted that Amtrak had shown a strong presence in commuter rail operations, had outscored defendant "head-to-head" in recent bids for similar contracts, and the defendant's own expert testified that Amtrak was "one of '*The Big Three*' in providing commuter rail services." *Id.* (emphasis added). Banneker's position was nowhere near Amtrak's in *Veolia*. Here, there are no allegations establishing that Banneker enjoyed stature equivalent to a "Big Three" bidder for a highly-specialized contract. Moreover, the clear language of the Term Sheet and Solicitation in this case reflected the uncertainty of reaching a Definitive Agreement.

The *Oceanic Exploration Co. v. ConocoPhillips, Inc.* case, in which plaintiffs had previously received a government concession to explore oil and natural gas in the Timor Gap and, *for thirty years*, had invested a significant amount of resources in research and development, is also factually inapposite. No. 04-332, 2006 WL 2711527, at *20 (D.D.C. Sept. 21, 2006).

## 2.    Banneker Did Not Allege Intentional Interference and Causation.

The district court also correctly concluded that Banneker failed to allege intentional interference causing a breach of any purported business expectancy.

Initially, Banneker's opposition to the motions to dismiss failed to address Defendants' argument that the Complaint did not allege causation. Accordingly, Banneker conceded its failure to plead that essential element. LAD Reply in Supp. of Mot. to Dismiss (Dkt. 31) at 5; LAD Mot. to Dismiss (Dkt. 20-1) at 5; Graham Mot. to Dismiss (Dkt. 21) at 33-34; *Hopkins,* 238 F. Supp. 2d at 178 (citing *FDIC v. Bender,* 127 F.3d 58, 67-68 (D.C. Cir. 1997)).

Even if Banneker had not made this concession, its Complaint foundered on the intentional interference/causation element of tortious interference.[20]

### a.    Graham

Despite reciting a litany of purported transgressions that Graham supposedly committed during Banneker's exclusive negotiation period, Banneker failed to articulate how Graham's supposed conduct resulted in Banneker's failure to reach a final development agreement. Banneker's suggestion that the Board's decision not to enter a final agreement was "led by Graham in an orchestrated manner,"

---

[20]    Although the district court did not address each of these reasons in concluding that Banneker failed to plead intentional interference/causation, this Court may affirm based on any of them. *See, e.g., Sanders v. WMATA*, 819 F.2d 1151, 1152, 1156 n.12 (D.C. Cir. 1987).

Compl. ¶ 12 (JA0015), was not supported by any facts alleged in the Complaint. And its contention that Graham somehow thwarted negotiations between Banneker and WMATA staff is belied by its own concession that those same negotiations continued for over twenty months and resulted in a staff recommendation in March 2010 that the Board approve the terms of a final agreement.  *Id.*  ¶¶ 3, 166 (JA0012, 0052).

Banneker's laundry list of Graham's purported transgressions included actions Graham was alleged to have taken *before* July 17, 2008, the date WMATA and Banneker executed the Term Sheet initiating the exclusive negotiations period. Compl. ¶¶ 27, 35, 40, 43, 46, 48, 60-62, 64-67, 70-75, 76-77, 80-83, 88-94, 96-98, 100, 102-112 (JA0019, 0021-23, 0025-39).  Banneker's complaint did not articulate how any of those alleged actions could have affected its negotiations during the exclusive negotiations period.  Nor did Banneker articulate how any of the alleged actions of Graham's during the exclusive negotiations period caused those negotiations to end in March 2010 without a final agreement. For example:

- Banneker alleged that Graham "directed WMATA's staff to stop or delay negotiations of the JDA and Lease." *Id.* ¶ 127 (JA0043).  Yet, as Banneker conceded, WMATA and Banneker engaged in "protracted" continuous negotiations from summer of 2008 through March 2010. *Id.* ¶ 3 (JA0012).

- Banneker alleged that Graham asked Banneker to join the U Street Business Improvement District ("BID"), characterizing the request "as a clear attempt at extortion." *Id.* ¶ 121 (JA0042). Yet Banneker did not allege how joining or not joining BID adversely affected Banneker's negotiations with WMATA.

- Banneker alleged that Graham "provided confidential Board information to LaKritz Adler about Banneker's proposal in order to provide LaKritz Adler with a competitive advantage," *id.* ¶ 134 (JA0045), yet failed to state what the information was or how LAD could have possibly used it to obtain a "competitive advantage" in negotiations between WMATA and Banneker.

- Banneker alleged that Graham told the principals of Banneker's one-time development partner Metropolis "to withdraw and not partner with Banneker – splintering the door open for Graham's campaign donor, LaKritz Adler, to join the team," *id.* ¶ 112 (JA0039), yet later acknowledged that "Banneker informed WMATA that Metropolis' principal had learned that he had cancer," and that "Banneker did not think that Metropolis would be able to continue working on the Project." *Id.* ¶ 136 (JA0045).

51

Banneker's claim also is predicated upon the implausible inference that Graham somehow controlled the votes of his fellow Board members and that, notwithstanding WMATA's investment of time and effort in the preceding twenty months of negotiation, each of those Board members voted against a final deal solely at Graham's behest. The Complaint offered nothing more than conclusory insinuation, devoid of factual enhancement, about Graham's "control" over Board action. Such conclusory pleading is insufficient to establish causation under *Iqbal/Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It was particularly deficient here because, just as LAD lacked the "power or authority to cause the WMATA Board to vote," Feb. Op. 21 (JA00251), Graham had only one vote among many and could not unilaterally decide the fate of Banneker's negotiations.

Banneker's suggestion that Graham exerted control over WMATA is further undermined by its concessions regarding how WMATA actually handled the negotiations. The Complaint alleged that, despite Graham's purported meddling, WMATA staff repeatedly recommended approval of a Definitive Agreement and, later, an amended Term Sheet. Compl. ¶¶ 161, 166, 214 (JA0051-52, 0067). The Complaint further acknowledged that, despite Graham's purported opposition to a deal with Banneker from the outset, the Board voted three times to extend Banneker's exclusivity period a total of fifteen months to give Banneker more time to negotiate a deal. *Id.* ¶¶ 206, 212, 244, 267 (JA0063, 0066, 0076, 0083-84). In

the face of these concessions, the fact that the Board voted unanimously not to extend the exclusivity period a *fourth* time hardly supports an inference that Graham somehow "orchestrated" WMATA's actions.

In sum, the Complaint failed to allege how Graham's actions in fact caused Banneker's negotiations with WMATA to fail or how, as one member of a multi-member Board, Graham was capable of causing them to fail.

### b.   LAD

There are three independent reasons why the Complaint failed to satisfy the intentional interference/causation element as to LAD.

*First*, only the WMATA Board could have voted to extend Banneker's exclusivity period and approve a final contract.  As the district court determined, LAD had no "power or authority to cause the WMATA Board to vote" and were, accordingly, incapable of causing WMATA to deprive Banneker of any expectancy. Feb. Op. 21 (JA00251).

*Second,* the Complaint did not contain allegations sufficient to establish that LAD's conduct actually caused any breach.  Banneker asserts in its brief that "[t]he Amended Complaint ma[de] Graham the primary wrongdoer in the entire affair." App. Br. 32.  It is thus unsurprising that Banneker lodged scant allegations against LAD.  None of them established causation.  Banneker's overriding claim was entirely conclusory: LAD "used their relationship with Graham" to induce Graham

to influence WMATA to deprive Banneker of a development agreement. Such a generalized allegation, "devoid of any factual enhancement," is inadequate to allege causation. *Iqbal*, 556 U.S. at 678. The Complaint was silent about *how* LAD purportedly influenced Graham. What's more, it never established any connection, through Graham, between LAD's conduct and WMATA's actions. As explained above, Graham lacked the ability to cause WMATA to deprive Banneker of a development agreement. And even if Graham had such ability, Banneker offered no indication of what Graham allegedly did at LAD's behest, nor did it deny that Graham acted for reasons of his own, wholly independent of LAD. To plead causation adequately here, Banneker had to allege facts showing that LAD did something *specific* to cause Graham to cause WMATA not to reach a deal with Banneker. The Complaint's conclusory allegation about LAD's influence on Graham did not come close to doing so. The supposed line running from LAD to Graham to WMATA was far too amorphous and attenuated to establish that LAD caused WMATA to terminate Banneker's purported expectancy.

The only *specific* allegation that Banneker made against LAD even hinting at causation is that LAD called WMATA employee Rosalyn Doggett to promote LAD's interests and provide negative information about Banneker. Compl. ¶¶ 262, 272 (JA0082, 0085); App. Br. 31-32, 38. But as Banneker has repeatedly maintained, Banneker continued negotiations with WMATA staff and staff "at all

levels" continued to recommend approval of a final agreement, even *after* LAD purportedly called WMATA staff. Compl. ¶¶ 152, 159, 166 (JA0049-52); App. Br. 15-16, 34. Banneker's allegations confirm not only that LAD had no power to influence the WMATA Board's decision, as the district court found, Feb. Op. 21 (JA00251), but that LAD's purported advocacy did not even influence the staff that made recommendations *to* the Board. The Complaint provided no factual basis for concluding that LAD caused Banneker to lose out on the opportunity to develop the Site.[21]

*Third*, Banneker failed to meet the "demanding test" requiring a showing of intentional interference by a business competitor. *Kreuzer v. George Washington Univ.*, 896 A.2d 238, 247-48 (D.C. 2006) (citation omitted). To plead intentional interference, the plaintiff must allege a "'strong showing of intent' to disrupt [its] business relationships" through "egregious" conduct, such as "libel, slander, physical coercion, fraud, misrepresentation, or disparagement." *Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32, 45 (D.D.C. 2005) (quoting *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 423 (D.D.C. 1988)); *see Modis, Inc. v. Infotran Sys., Inc.*, 893 F. Supp. 2d 237, 241-42 (D.D.C. 2012);

---

[21]    The only other factual allegation against LAD is that it asked Banneker to buy the right to ground lease an adjacent parcel or to include LAD as a development partner. Compl. ¶¶ 70, 71, 73-75, 84, 86-87, 111-113, 119, 125, 131-135, 246, 247(4), (5), 256, 259, 271, 275(4), (5) (JA0027-29, 0032-33, 0039-42, 0044-45, 0076-77, 0080-81, 0084-86). Even if true, such overtures sought to take advantage of Banneker's negotiations with WMATA, not interfere with them.

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 498-99 (D.C. Cir. 1995) (reversing finding of tortious interference where there was nothing "more than the rankest speculation" that defendant "harbored any ill motive or intent to disrupt [plaintiff's] economic advantage"). Banneker conceded this heightened standard, but did not come close to meeting it. Banneker Opp. to LAD Mot. to Dismiss (Dkt. 26) at 8.

Nowhere did Banneker contend that its meager contentions against LAD—the purported calls to WMATA staff, the unspecified influence on Graham, and the purported effort to take advantage of Banneker's Term Sheet for their own benefit—constituted the kind of malicious, egregious misconduct required to establish intentional interference by a competitor. LAD's purported calls to WMATA staff reflected, at most, LAD's effort to keep its hat in the ring. The Complaint did not even allege that what LAD told WMATA was false.[22] LAD's

---

[22]    Banneker cites *PM Servs. v. Odoi Assocs., Inc.*, Civ. No. 03-1810, 2006 WL 20382 (D.D.C. Jan. 4, 2006), to suggest that, by purportedly "using" certain unidentified confidential information about Banneker's project "leaked" by Graham "to make a competing offer" to WMATA (in fact, Banneker's proposals were discussed at *public* WMATA hearings), LAD engaged in conduct that warrants an "inference" of intentional interference. App. Br. 14, 32, 38-39. But the Complaint never alleged that LAD made a competing offer, and the paragraph in the Complaint that Banneker cites for that allegation—App. Br. 14 (citing Compl. ¶ 261)—did not contain it. Moreover, *PM Services* is inapposite. PM alleged that a former employee, in breach of his duty of loyalty, "misappropriated confidential and/or proprietary information from PM" and "diverted and usurped PM's corporate opportunities." 2006 WL 20382 at *34-36. The court found those allegations of unlawful behavior sufficient to satisfy the heightened standard for

purported "influencing" of Graham reflected nothing more than the attempted persuasion of an elected official to support LAD's business endeavors in the official's district—something that is part of the political process. And LAD's purported effort to sell Banneker its right to ground lease an adjacent parcel or become part of Banneker's development team was merely an attempt to capitalize on Banneker's negotiations with WMATA, not interfere with them. None of these alleged actions constituted libel, slander, physical coercion, fraud, misrepresentation or disparagement (which requires falsehood). Indeed, Banneker repeatedly acknowledged that LAD were acting in their *own* financial interest "in order to benefit their firm." Banneker Opp. to LAD Mot. to Dismiss (Dkt. 26) at 16; *id.* at 11-14, 20, 26, 28, 35; Compl. ¶¶ 119, 133 (JA0041, 0045). This acknowledgement, standing alone, was fatal to Count III. *Modis*, *Inc.*, 893 F. Supp. 2d at 241-42 (no intentional interference where competitor's "purpose is at least in part to advance his interest in competing with the other").

---

proving intentional interference. *Id.* at *36. By contrast, the Complaint here did not allege that LAD stole confidential information in violation of a fiduciary duty, did not aver how LAD supposedly used it to harm Banneker, and did not claim how LAD *could have* used it to harm Banneker, as the Complaint did not even identify what the information was or establish that it was confidential or proprietary.

**B.    The District Court Properly Dismissed Banneker's Claim for Tortious Interference with Contract (Count IV).**

The district court correctly held that Banneker failed to allege tortious interference with Banneker's exclusive right to negotiate under the Term Sheet. For several reasons, Banneker did not adequately plead facts sufficient to satisfy the third element of its claim—intentional interference causing a breach—as to either Graham or LAD.

*First,* as set forth in Section I.A., *supra,* the district court correctly concluded that Banneker did not plausibly allege any underlying breach of the Term Sheet's exclusive negotiation provision.

*Second,* as set forth in Section V.A.2., *supra,* the Complaint did not adequately plead that either Graham or LAD caused any such breach.

*Third*, as set forth in Section V.A.2.b., *supra*, the Complaint did not adequately plead that LAD intentionally interfered with Banneker's exclusive right to negotiate, given the law requiring Banneker to allege egregious, ill-intended interference, particularly where the defendant is a competitor.

**VI.    BANNEKER'S CLAIM OF CIVIL CONSPIRACY (COUNT VIII) MUST FAIL BECAUSE THE UNDERLYING TORT CLAIMS FAIL.**

The district court held that Banneker failed to state a claim for civil conspiracy because Banneker failed to adequately allege any underlying tort. Feb. Op. 25-26 (JA00255-56). This ruling is unassailable. Civil conspiracy is not an

independent cause of action; it is a means to establish vicarious liability for an underlying tort.  *See Exec. Sandwich Shoppe, Inc. v. Carr Realty Grp.*, 749 A.2d 724, 738 (D.C. 2000).  Because Banneker failed to state any viable tort claims against LAD or Graham, Banneker failed to state a claim for conspiracy.

## VII.   THE NOERR-PENNINGTON DOCTRINE IMMUNIZES LAD.

Because Banneker's claims against LAD rest on allegations that LAD sought to advance their own interests by petitioning government actors, the *Noerr-Pennington* doctrine provides an alternate ground for affirming the district court's decision.  LAD raised this defense below.  LAD Mot. to Dismiss (Dkt. 20-1) at 9; LAD Reply in Supp. of Mot. to Dismiss (Dkt. 31) at 11-15.

The *Noerr-Pennington* doctrine, "rooted in First Amendment law," "insulates from antitrust challenge competitors' decision to combine to petition the government, even if their underlying intention is to restrain competition or gain advantage over competitors."  *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 817 (D.C. Cir. 2001) (citations omitted).  The doctrine applies with equal force to protect against liability for state tort claims.  *IGEN Int'l, Inc. v. Roche Diagnostics GMBH*, 335 F.3d 303, 310 (4th Cir. 2003); *Brownsville Golden Age Nursing Home, Inc. v. Wells,* 839 F.2d 155, 159–60 (3d Cir. 1988); *Havoco of Am., Ltd. v. Hollobow,* 702 F.2d 643, 649-50 (7th Cir.1983); *Eurotech Inc. v. Cosmos European Travels Aktiengesellschaft*, 189 F. Supp. 2d 385, 391-92 (E.D. Va.

2002); *Baltimore Scrap Corp. v. David J. Joseph Co.*, 81 F. Supp. 2d 602, 620-21 (D. Md. 2000), *aff'd*, 237 F.3d 394 (4th Cir. 2001).[23]

Banneker alleged that, every few months after the Term Sheet was signed, LAD called WMATA staff to promote its own interest in the Site and furnish "negative information" about Banneker.  Compl. ¶¶ 262, 272 (JA0082, 0085). Banneker further maintained that LAD "used their relationship with Graham" to "induce" Graham and WMATA to prevent Banneker from reaching a Definitive Agreement.  *Id.* ¶¶ 248, 262, 279-285 (JA0079, 0082, 0088-89).  These factual allegations, which are the underpinning of all of Banneker's claims against LAD, complain of precisely the type of activity that *Noerr-Pennington* protects.

WMATA is a governmental entity that derives its authority from a congressionally-authorized Interstate Compact.  D.C. Code § 9-1107.01; *see also Jones v. WMATA*, 742 F. Supp. 24, 25 (D.D.C. 1990).  WMATA staff are thus government agency officials.  Similarly, at all relevant times, Graham, a WMATA Board member and a Councilmember, was both an administrative official and legislator.  Accordingly, even taking as true the Complaint's allegations that LAD harmed Banneker by continuing pursuit of the Site with WMATA staff and Graham, *Noerr-Pennington* shields LAD from liability.  *See Columbia v. Omni*

---

[23]     Although this Court has not yet squarely ruled on whether *Noerr-Pennington* applies to state law tort claims, it has suggested it could.  *Whelan v. Abell*, 48 F.3d 1247, 1253-54 (D.C. Cir. 1995).

*Outdoor Adver., Inc.*, 499 U.S. 365, 379-80, 384 (1991) (*Noerr-Pennington* protected billboard advertiser who petitioned city to pass new ordinance to severely limit plaintiff-competitor's ability to enter market; "federal antitrust laws . . . do not regulate the conduct of private individuals in seeking anticompetitive action from the government."); *Oberndorf v. City and Cnty. of Denver*, 900 F.2d 1434, 1439-40 (10th Cir. 1990), *abrogated in part on other grounds Columbia*, 499 U.S. 365 (*Noerr-Pennington* protected developer who made project proposals and met with City Council members to "represent[] its own business and economic interests in the proposed revitalization").

In a unique circumstance inapplicable here, this Court declined to recognize *Noerr-Pennington* immunity. *Hecht v. Pro-Football, Inc.*, 444 F.2d 931, 940-942 (D.C. Cir. 1971). *Hecht* ruled out *Noerr-Pennington* immunity because the commercial purpose and impact of the statute that created the government agency the defendants petitioned, the D.C. Armory Board, were insufficiently expansive to preclude application of antitrust laws. *See id.* at 946-47. The broad commercial purpose and impact of the Interstate Compact that established WMATA and the vast public transportation systems it operates—which carry hundreds of thousands of people every day to work, to shop, to dine, to attend entertainment and otherwise to participate in the regional economy—stand in stark contrast.

## VIII.  CONCLUSION.

The Court should affirm the judgment of the district court.

Dated: February 6, 2015                  Respectfully submitted,

                                         /s/

Gerard J. Stief                          Douglas M. Bregman
Washington Metropolitan Area             Geoffrey T. Hervey
    Transit Authority                    Bregman, Berbert,
Office of the General Counsel               Schwartz & Gilday LLC
600 5th Street, N.W.                     7315 Wisconsin Avenue
Washington, D.C. 20001                   Suite 800 West
(202) 962-1463                           Bethesda, Maryland 20814
(202) 962-2550 fax                       (301) 656-2707
gstief@wmata.com                         (301) 961-6525 fax
                                         dbregman@bregmanlaw.com
*Counsel for Appellee Washington*        ghervey@bregmanlaw.com
*Metropolitan Area Transit Authority*
                                         *Counsel for Appellee Washington*
                                         *Metropolitan Area Transit Authority*


V. David Zvenyach                        Brian L. Schwalb
John Hoellen                             Seth A. Rosenthal
Manasi Venkatesh                         Moxila A. Upadhyaya
Daniel Golden                            VENABLE LLP
Office of the General Counsel for the    575 7th Street, N.W.
Council of the District of Columbia      Washington, D.C. 20004-1601
1350 Pennsylvania Ave., N.W., Suite 4    (202) 344-4000
Washington, D.C. 20004                   (202) 344-8300 fax
(202) 724-8026                           blschwalb@venable.com
(202) 724-8129 fax                       sarosenthal@venable.com
vzvenyach@dccouncil.us                   maupadhyaya@venable.com
jhoellen@dccouncil.us
mvenkatesh@dccouncil.us                  *Counsel for Appellees LaKritz Adler*
dgolden@dccouncil.us                     *Development LLC, Joshua A. Adler, and*
                                         *Robb M. LaKritz*
*Counsel for Appellee Jim Graham*

# STATUTORY ADDENDUM

**TABLE OF CONTENTS**

28 U.S.C. § 1291 ............................................................................................. A-1

28 U.S.C.A. § 1367 ......................................................................................... A-2

D.C. Code § 9-1107.01 (2001) (preface only) ...................................... A-4

D.C. Code § 9-1107.01 (4) (2001) ........................................................ A-5

D.C. Code § 9-1107.01 (5)(a) (2001) .................................................... A-6

D.C. Code § 9-1107.01 (8) (2001) ........................................................ A-7

D.C. Code § 9-1107.01 (12)(d) (2001) .................................................. A-8

D.C. Code § 9-1107.01 (12)(f) (2001) ................................................... A-9

D.C. Code § 9-1107.01 (80) (2001) ...................................................... A-10

D.C. Code § 9-1107.01 (81) (2001) ...................................................... A-11

**28 U.S.C.A. § 1291**

United States Code Annotated
Title 28. Judiciary and Judicial Procedure (Refs & Annos)
Part IV. Jurisdiction and Venue (Refs & Annos)
Chapter 83. Courts of Appeals (Refs & Annos)
28 U.S.C.A. § 1291
§ 1291. Final decisions of district courts


The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**28 U.S.C.A. § 1367**

United States Code Annotated
Title 28. Judiciary and Judicial Procedure (Refs & Annos)
Part IV. Jurisdiction and Venue (Refs & Annos)
Chapter 85. District Courts; Jurisdiction (Refs & Annos)
28 U.S.C.A. § 1367

## § 1367. Supplemental jurisdiction

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

A-2

(d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

(e) As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

**D.C. Code § 9-1107.01 (2001) (preface)**

West's District of Columbia Code Annotated 2001 Edition
Division I. Government of District.
Title 9. Transportation Systems. (Refs & Annos)
Subtitle III. National Capital Region Transportation.
Chapter 11. National Capital Region Transportation.
Subchapter IV. Washington Metropolitan Area Transit Authority Compact. (Refs & Annos)
DC ST § 9-1107.01
Formerly cited as DC ST 1981 §  1-2431

§ 9-1107.01. Congressional consent given to Compact amendment.
Effective: March 23, 2010

The Congress hereby consents to, adopts and enacts for the District of Columbia an amendment to the Washington Metropolitan Area Transit Regulation Compact, for which Congress heretofore has granted its consent (§§ 9-1103.01 and 9-1103.02) by adding thereto Title III, known as the Washington Metropolitan Area Transit Authority Compact (referred to in this subchapter as Title III), substantially as set out below.

**D.C. Code § 9-1107.01 (4)**

West's District of Columbia Code Annotated 2001 Edition
Division I. Government of District.
Title 9. Transportation Systems. (Refs & Annos)
Subtitle III. National Capital Region Transportation.
Chapter 11. National Capital Region Transportation.
Subchapter IV. Washington Metropolitan Area Transit Authority Compact. (Refs & Annos)
DC ST § 9-1107.01
Formerly cited as DC ST 1981 § 1-2431

§ 9-1107.01. Congressional consent given to Compact amendment.
Effective: March 23, 2010


**Washington Metropolitan Area Transit Authority**

4. There is hereby created, as an instrumentality and agency of each of the signatory parties hereto, the Washington Metropolitan Area Transit Authority which shall be a body corporate and politic, and which shall have the powers and duties granted herein and such additional powers as may hereafter be conferred upon it pursuant to law.

**D.C. Code § 9-1107.01 (5)(a)**

West's District of Columbia Code Annotated 2001 Edition
Division I. Government of District.
Title 9. Transportation Systems. (Refs & Annos)
Subtitle III. National Capital Region Transportation.
Chapter 11. National Capital Region Transportation.
Subchapter IV. Washington Metropolitan Area Transit Authority Compact. (Refs & Annos)
DC ST § 9-1107.01
Formerly cited as DC ST 1981 § 1-2431

§ 9-1107.01. Congressional consent given to Compact amendment.
Effective: March 23, 2010


**Board Membership**

5.(a) The Authority shall be governed by a Board of 8 Directors consisting of 2 Directors for each Signatory, and 2 for the federal government (one of whom shall be a regular passenger and customer of the bus or rail service of the Authority). For Virginia, the Directors shall be appointed by the Northern Virginia Transportation Commission; for the District of Columbia, by the Council of the District of Columbia; for Maryland, by the Washington Suburban Transit Commission; and for the federal government, by the Administrator of General Services. For Virginia and Maryland, the Directors shall be appointed from among the members of the appointing body, except as otherwise provided herein, and shall serve for a term coincident with their term on the appointing body. A Director for a Signatory may be removed or suspended from office only as provided by the law of the Signatory from which he was appointed. The nonfederal appointing authorities shall also appoint an alternate for each Director. In addition, the Administrator of General Services shall also appoint 2 nonvoting members who shall serve as the alternates for the federal Directors. An alternate Director may act only in the absence of the Director for whom he has been appointed as an alternate, except that, in the case of the District of Columbia where only one Director and his alternate are present, such alternate may act on behalf of the absent Director. Each alternate, including the federal nonvoting Directors, shall serve at the pleasure of the appointing authority. In the event of a vacancy in the Office of Director or alternate, it shall be filled in the same manner as an original appointment.

**D.C. Code § 9-1107.01 (8)**

West's District of Columbia Code Annotated 2001 Edition
Division I. Government of District.
Title 9. Transportation Systems. (Refs & Annos)
Subtitle III. National Capital Region Transportation.
Chapter 11. National Capital Region Transportation.
Subchapter IV. Washington Metropolitan Area Transit Authority Compact. (Refs & Annos)
DC ST § 9-1107.01
Formerly cited as DC ST 1981 §  1-2431

§ 9-1107.01. Congressional consent given to Compact amendment.
Effective: March 23, 2010


**Quorum and Actions by the Board**

8.(a) Four Directors or alternates, consisting of at least one Director or alternate appointed from each Signatory, shall constitute a quorum and no action by the Board shall be effective unless a majority of the Board present and voting, which majority shall include at least one Director or alternate from each Signatory, concur therein; provided, however, that a plan of financing may be adopted or a mass transit plan adopted, altered, revised, or amended by the unanimous vote of the Directors representing any two Signatories.


(b) The actions of the Board shall be expressed by motion or resolution. Actions dealing solely with internal management of the Authority shall become effective when directed by the Board, but no other action shall become effective prior to the expiration of thirty days following its adoption; provided, however, that the Board may provide for the acceleration of any action upon a finding that such acceleration is required for the proper and timely performance of its functions.

**D.C. Code § 9-1107.01 (12)(d)**

West's District of Columbia Code Annotated 2001 Edition
Division I. Government of District.
Title 9. Transportation Systems. (Refs & Annos)
Subtitle III. National Capital Region Transportation.
Chapter 11. National Capital Region Transportation.
Subchapter IV. Washington Metropolitan Area Transit Authority Compact. (Refs & Annos)
DC ST § 9-1107.01
Formerly cited as DC ST 1981 § 1-2431

§ 9-1107.01. Congressional consent given to Compact amendment.
Effective: March 23, 2010

**GENERAL POWERS**
**Enumeration**

12. In addition to the powers and duties elsewhere described in this Title, and except as limited in this Title, the Authority may:

* * *

(d) Construct, acquire, own, operate, maintain, control, sell and convey real and personal property and any interest therein by contract, purchase, condemnation, lease, license, mortgage or otherwise but all of said property shall be located in the Zone and shall be necessary or useful in rendering transit service or in activities incidental thereto;

A-8

**D.C. Code § 9-1107.01 (12)(f)**

West's District of Columbia Code Annotated 2001 Edition
Division I. Government of District.
Title 9. Transportation Systems. (Refs & Annos)
Subtitle III. National Capital Region Transportation.
Chapter 11. National Capital Region Transportation.
Subchapter IV. Washington Metropolitan Area Transit Authority Compact. (Refs & Annos)
DC ST § 9-1107.01
Formerly cited as DC ST 1981 § 1-2431

§ 9-1107.01. Congressional consent given to Compact amendment.
Effective: March 23, 2010

**GENERAL POWERS**
**Enumeration**

12. In addition to the powers and duties elsewhere described in this Title, and except as limited in this Title, the Authority may:

* * *

(f) Enter into and perform contracts, leases and agreements with any person, firm or corporation or with any political subdivision or agency of any signatory party or with the federal government, or any agency thereof, including, but not limited to, contracts or agreements to furnish transit facilities and service;

**D.C. Code § 9-1107.01 (80)**

West's District of Columbia Code Annotated 2001 Edition
Division I. Government of District.
Title 9. Transportation Systems. (Refs & Annos)
Subtitle III. National Capital Region Transportation.
Chapter 11. National Capital Region Transportation.
Subchapter IV. Washington Metropolitan Area Transit Authority Compact. (Refs & Annos)
DC ST § 9-1107.01
Formerly cited as DC ST 1981 §  1-2431

§ 9-1107.01. Congressional consent given to Compact amendment.
Effective: March 23, 2010

**Liability for Contracts and Torts**

80. The Authority shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function. The exclusive remedy for such breach of contracts and torts for which the Authority shall be liable, as herein provided, shall be by suit against the Authority. Nothing contained in this Title shall be construed as a waiver by the District of Columbia, Maryland, Virginia and the counties and cities within the Zone of any immunity from suit.

**D.C. Code § 9-1107.01 (81)**

West's District of Columbia Code Annotated 2001 Edition
Division I. Government of District.
Title 9. Transportation Systems. (Refs & Annos)
Subtitle III. National Capital Region Transportation.
Chapter 11. National Capital Region Transportation.
Subchapter IV. Washington Metropolitan Area Transit Authority Compact. (Refs
& Annos)
DC ST § 9-1107.01
Formerly cited as DC ST 1981 §  1-2431

§ 9-1107.01. Congressional consent given to Compact amendment.
Effective: March 23, 2010


**Jurisdiction of Courts**

81. The United States District Courts shall have original jurisdiction, concurrent
with the courts of Maryland, Virginia, and the District of Columbia, of all actions
brought by or against the Authority and to enforce subpoenas issued under this
Title. Any such action initiated in a State or District of Columbia court shall be
removable to the appropriate United States District Court in the manner provided
by 28 U.S.C. § 1446.

## CERTIFICATE OF COMPLIANCE
## WITH FED. R. APP. P. RULE 32(a)

**Type-Volume Limitation:**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because the brief contains 13,820 words as counted by Microsoft Word, excluding the parts of the brief that are exempted by Fed. R. App. P. Rule 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

**Typeface:**

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

/s/ V. David Zvenyach
*On behalf of all Appellees*

Dated: February 6, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of February, 2015, I caused the foregoing to be served via this Court's electronic filing system upon all counsel of record.

/s/   V. David Zvenyach
V. David Zvenyach

February 6, 2015